## CARROLL *vs.* THE STATE.

1. A mere civil trespass upon a man's house, unaccompanied by such force as would make it a breach of the peace, is not a sufficient provocation to reduce the killing of the trespasser to manslaughter, if committed under circumstances from which the law would imply malice, as with a deadly weapon.

2. If the trespass is forcible, the owner may resist the entry, but he has no right to kill the assailant, unless it is rendered necessary to prevent a felonious destruction of his property, or to defend himself against loss of life or great bodily harm; if he kills the assailant when there is not a reasonable ground for apprehending imminent danger to his person or property, it is manslaughter; and, if done with malice, express or implied, it is murder.

3. If the assault is made under circumstances which would create a just apprehension in the mind of a reasonable man of imminent danger to his person or property, the owner may lawfully act upon appearances, and kill the assailant; the law does not require that the danger should be real.

4. An entry into a man's house, after a warning not to enter, does not amount to a forcible trespass.

5. In general, threats of personal violence made by the deceased against the prisoner, and not communicated to him, can only be received in evidence when they constitute part of the *res gestæ*.

6. The prisoner's confession cannot be rejected as evidence merely because the question to which it was a reply, assumed his guilt.

7. The officer who was conveying the prisoner to jail after his commitment, asked him " whether, if it was to do over again, he would do it;" to which the prisoner replied, " *Yes Sir-ree Bob.*" *Held*, that the question and answer were admissible evidence.

8. Evidence that, in making this reply, the prisoner's " manner was short," is also admissible for the State.

ERROR to the Circuit Court of Autauga.
Tried before the Hon. NATHAN COOK.

THE plaintiff in error, John Carroll, was indicted for the murder of one John Key. On the trial, the State introduced evidence tending to prove that the deceased was found dead at the house of the prisoner, and that he came to his death from gun-shot wounds. The State then offered to prove, by one Goree, that he was one of the guard who conveyed the prisoner to jail after his commitment; that while he was conveying the

prisoner to jail, he asked him, with a view of ascertaining whether he felt any penitence, 'if it was to do over again, would he do it,' which question was objected to; but, on its being proved to the court that no threats were made, and no inducements held out to the prisoner, to induce him to make any confessions, the court overruled the objection, and the defendant excepted. The witness stated that the prisoner replied 'Yes Sir-ree, Bob;' to which answer the prisoner's counsel also objected, and moved to exclude it from the jury; but the objection was overruled, and the prisoner excepted. The State then asked the witness, 'what was the manner of the prisoner when he made the reply,' and the witness stated 'that his manner was short.' The question and answer were severally objected to by the prisoner, but his objections were overruled, and he excepted.

One witness testified, that the deceased had agreed to live with the prisoner during the year 1851, and was to receive one third of what was made on the place. Another witness testified, that the deceased had engaged as overseer for the prisoner during the year 1851, and was to receive a part of the crop as compensation for his services; and it was also in evidence that, some four or five days before the deceased was found dead, he and the prisoner met, and the latter stated to the deceased 'that he had told him to leave his place before, and he would not do it; that he then told him, if ever he entered his dwelling-house again, after a particular day which he named, he would kill him.' It was further in evidence, that, about ten or fifteen days before the deceased was found dead, the prisoner had requested one Skelton to see the deceased, who was at work in a field, and endeavor to get a settlement with him, and get him to leave the place; that Skelton went, and endeavored to get the deceased to submit to arbitration his work and the difficulty which had arisen between him and the prisoner—which the deceased refused; that the deceased also refused to leave the place of the prisoner, and said that, if ever the prisoner interfered with him, in any manner, form or shape, he would kill him, or beat him into mince meat, and that the prisoner was informed of this conversation, and of the threats thus made, before the deceased came to his death.

It was also proved, that, on the evening on which the killing occurred, the prisoner took the trunk belonging to the deceased,

and carried it and some clothing which belonged to him to the gate of the prisoner's premises; that the deceased slept in a room of the prisoner's house, and that, on the same evening, the prisoner sent a message to the deceased, to the effect that he wanted him to leave the place, and that, if he ever entered his house again, he would kill him; but this message was not delivered; that, about dark, the deceased came out of the field where he had been at work, to the gate of the prisoner's premises, and was informed by the latter that he wished him to leave the place, and that he then repeated the message which he had sent him; that the deceased said something in reply, which the witness did not understand; that, shortly afterwards the report of a gun was heard in the house; and soon after that the deceased was found dead in the room of the house in which he had been in the habit of sleeping, and into which he had entered five or six feet before he was shot; that his head was resting on the door-sill, his trunk lying across his body, and his feet towards. the place where the prisoner was sitting with a gun by his side.

During the trial, the prisoner offered to prove that the deceased had made threats of personal violence against him about a fortnight before the killing occurred, other than those before detailed; but, it appearing that these threats had not been communicated to the prisoner before the killing, they were excluded by the court, to which ruling the prisoner excepted. The purpose for which these threats were offered was, to show the character of the conduct of the deceased in entering the house after he had been warned not to enter. There was no witness present at the time of the killing, nor was there any evidence of any act of violence done by the deceased after he had entered the house, unless his entry therein under the circumstances was an act of violence. It was also in evidence, that the deceased was stout and healthy, while the prisoner was old and infirm, and that the character of the former was that of a violent and quarrelsome man.

The prisoner's counsel requested the court to charge the jury, "that, if they believed from the evidence that the defendant had notified the deceased not to enter his dwelling-house, and that the deceased was a stout, healthy man, and the defendant a weak and infirm man, and that the deceased had previously threatened that, if the defendant interfered with him, in any

manner, form or shape, he would kill him, or beat him into mince-meat, and that the defendant knew of such threats, and that the deceased was a violent man, and that after the deceased was notified not to enter the dwelling house of the defendant he did enter it, and that after he had entered the defendant's dwelling house, and whilst he was in the house, the defendant killed him, under a well grounded and honest belief, created by all the circumstances, that it was necessary for him to kill the deceased, to protect his possession of his dwelling house, then the prisoner could not be convicted of murder in either degree;" which charge the court refused to give, and the prisoner excepted.

ELMORE & YANCEY and N. HARRIS, for plaintiff in error:

1. The evidence of Goree was conducive to show a confession of the murder by the prisoner, after he had been committed, and while in the custody of Goree. The question put by Goree was predicated upon and assumed the prisoner's guilt.—Commonwealth v. Mosler, 4 Barr 264 ; Clarissa v. The State, 11 Ala. R. 57 ; Stoke's case, American Law Register, May No. 1853.

2. The court erred in admitting the testimony of Goree as to the prisoner's manner in replying to his question.—Johnson v. The State, 17 Ala. R. 623. The answer of the witness, " that his manner was short," was but the conclusion or opinion of the witness, no facts being stated upon which to base it.

3. The court erred in excluding from the jury the threats of personal violence made by the deceased against the prisoner.— This evidence tended to prove the character of the deceased, and therefore was admissible. It also tended to prove the character of the act of entering the house, and that was material on the trial.— Riddle v. Brown et al., 20 Ala. R. 412; Newton v. Holford, 47 En. C. L. R. 537 ; Prichett v. The State, 21 Ala. R. 42; Quesenberry v. The State, 3 Stew. & P. 308.

4. The charge asked should have been given, because; 1. It negatived the existence of malice on the part of the prisoner towards the deceased, and without malice, a party cannot be convicted of murder in either degree ; 2. The killing of a person who commits a trespass on the dwelling house of another, is not murder, but manslaughter.—1 Russell on Crimes 662. A man's dwelling house is regarded as his castle, and when assail-

ed in it he is not bound to retreat; 3. The charge was correct as to the doctrine of reasonable apprehension of danger.—Oliver v. The State,.17 Ala. 598; Monroe v. The State, 5 Geo. R. 85; 1 Car. & P. 319; Cook's case, Cro. Car. 537.

P. T. SAYRE, for the Attorney General, with whom was THOS. H. WATTS, *contra:*

There was nothing improper in permitting proof of the conversation between Goree and the prisoner. The proper predicate was laid, the proof showing that no threats or inducements were held out to him to make confessions.—1 Phil. Ev. 116.

The court properly excluded proof of those threats which had not been communicated to the prisoner.—Powell v. The State, 19 Ala. 581. They are not competent even to prove character.—Wharton's Criminal Law 172; State v. Field, 14 Maine 246.

The charge asked was properly refused. No trespass on lands or goods will reduce the killing from murder to manslaughter—1 East's Cr. Law 233; 1 Russell on Crimes 455. So, every trial provocation, or even a blow, will not reduce the killing to manslaughter—1 East 234. It is not every entry into a man's dwelling house, that will justify a killing, or reduce it to manslaughter; a forcible attack must be made; some degree of violence must be used; the party slain must have no right to enter the house, he must be a trespasser.—1 East's Cr. Law 287. No man has a right to resort to extreme measures in the first place; he must first try gentle means.—McCoy v. The State, 3 English 454.

The proof in this case shows, that no violence was used by the deceased; that he was in the room in which he had been in the habit of sleeping; that he had a right to be there, by a contract which had never been abrogated by his consent; and being there under such a contract, he cannot be considered in the light of a trespasser.

The previous threats made by the deceased could not have affected the mind of the prisoner at the time of the commission of the act; and even if, from those threats, he believed that the deceased intended to kill him, he had no right to anticipate him, unless he attempted to execute his design, or was in a situation to do so, and thereby induced a reasonable belief that he intended to do it immediately.—The State v. Scott, 4 Iredell 415.

The record shows, that the conduct of the prisoner was violent, and calculated to excite to the highest degree the passions of the deceased; he had sent him word that he would kill him, if he again entered his house, and, without his knowledge, removed his trunk to the gate. The deceased is found dead in the room usually occupied by him, with his trunk, and the prisoner sitting at a little distance from him, with his gun. This shows that no violence was used by the deceased, and no inference of a design to use violence could be drawn from these facts.

In order to reduce the killing from murder to manslaughter, an attempt must have been made to take violent possession of the dwelling house. There must have been some effort to interfere with the prisoner's possession; the mere entry into the house, by one who had a right to enter, although commanded by the owner not to do it, does not constitute such violence.

The conclusion is irresistible, that the prisoner, in pursuance of his previously expressed design, shot the deceased as soon as he entered the room, and not because there was any "imperious necessity to take life," which must exist, in order to justify it.—Oliver v. The State, 17 Ala. 598.

GOLDTHWAITE, J.—We will first consider the questions presented by the refusal of the court to give the charge requested.

This charge was, in effect, that if the prisoner acted under a well grounded apprehension, created by all the circumstances, that it was necessary to take the life of the deceased to protect the possession of his own dwelling house, he could not be convicted of murder in either degree. To ascertain whether this charge asserted a sound legal proposition, as applicable to the evidence, we must first determine the extent and degree of protection which the law affords to the inhabitant of a dwelling house in maintaining his possession.

Lord Hale says: "If A fears, upon just grounds, that B intends to kill him, and is assured that he provides weapons, and lies in wait so to do, yet without an actual assault by B upon A, or upon his house, to commit that fact, A may not kill B by way of prevention; but he must avoid the danger by flight or other means; for a bare fear, though upon a just cause, gives

not a man power to take away the life of another, but it must be an actual inevitable danger of his own life."—1 Hale's P. C. 51.

Again: "A is in possession of the house of B. B endeavors to enter upon him. A can neither justify the assault or the beating of B, for B had the right of entry into the house; but if A be in possession of a house, and B as a trespasser enter without title upon him, A may not beat him, but may quietly lay his hands upon him to put him out, and if B resists and assaults A, then A may justify the beating of him, as of his own assault. But if A kills him in defence of his house, it is neither justifiable nor within the privilege *se defendendo*, for he entered as a trespasser, and therefore it is at least common manslaughter;" and he cites Harcourt's case in support of this, who "being in possession of a house, A endeavored to enter, and shot an arrow at them within the house, and Harcourt from within shot an arrow at those who would have entered, and killed one of the company; which was ruled manslaughter, and not *se defendendo*, because there was no danger to his life from those without."—1 Hale's P. C. 485–6.

Mr. East, in his Crown Law, lays down the same doctrine, almost in the words of Lord Hale, and cites Cook's case, reported in Cro. Car. 537, which was where the sheriff's officer and bailiffs, having civil process against Cook, called to him to open his doors because he had such process; whereupon Cook forbid their entrance; upon which they broke the window, and then came to the door and tried to force it open, breaking off one of the hinges, upon which Cook discharged a musket and killed the officer, and it was held manslaughter.—East's Crown Law.

Hawkins says: "Neither can a man justify the killing of another in defence of his house or goods, or even of his person, from a bare private trespass; and therefore he that kills another who, claiming a title to his house, attempts to enter it by force, and shoots at it, or that breaks open his windows in order to arrest him, or that persists in breaking his hedges, after he was forbidden, is guilty of manslaughter.—Hawkins, 83.

It is to be remarked, that every case cited by these authors, in relation to a homicide committed upon an assault of the dwelling house, was one of actual positive force, exceeding a mere trespass; and in the case of the trespasser entering without title, while Lord Hale admits that, in case of resistance and assault,

the beating of him may be justified, he says that if A kills him in defence of his house, it is *at least* common manslaughter, for the reason that it was but a trespass; but we are no where told that taking life upon an assault is less culpable, under the same circumstances, than the same act upon an assault of the person. The rule of the common law is, that a man may repel force by force in defence of his person, habitation or property, against one who manifestly endeavors, by *violence* or *surprise,* to commit a known felony, such as rape, robbery, arson, burglary, or the like; and in these cases he is not obliged to retreat, but may pursue his adversary until he has freed himself from all danger.—1 East's P. C. 271–2; Fos. 271. In other cases, the law requires the use of every precaution consistent with safety, even to flight itself, before taking life; unless, indeed, the party has the protection of his house, which excuses him from retreating further (1 Hale, 484; 1 Russ. 545;) and this, we think, is the only difference between assaults upon the dwelling and upon the person, but that in all other respects they are governed by the same principles. The law laid down in the case of Mead, 1 Lewin C. C. 184, tends very strongly to support the views we have expressed. There, a number of persons who had abused Mead during the day, came in the night to his house, singing songs of menace and using violent language, indicating that they had come with no friendly or peaceable intention, and Mead, under the apprehension, as he alleged, that his life and property were in danger, fired a pistol, by which one of the party was killed. Holroyd, J., told the jury "that a civil trespass will not excuse the firing of a pistol at a trespasser in sudden resentment, or in anger. If a person takes forcible possession of another's close, so as to be guilty of a breach of the peace, it is more than a trespass. So, if a man with force invades and enters the dwelling of another. But a man is not authorized to fire a pistol on every invasion or intrusion of his house. He ought, if he has a reasonable opportunity, to endeavor to remove him, without having recourse to the last extremity. But the making of an attack upon a man's dwelling, and especially in the night, the law regards as equivalent to an assault upon a man's person; for a man's house is his castle, and therefore, in the eye of the law, it is equivalent to an assault; but no words and singing are an assault, nor will they authorize an assault in return."

Our conclusion is, that a mere civil trespass upon a man's house, unaccompanied with such force as to make it a breach of the peace, would not be a provocation which would reduce the killing to manslaughter, if it was done under circumstances from which the law would imply malice, as with a deadly weapon. For trespasses with force, it may be murder or manslaughter, according to the circumstances. The owner may resist the entry, but he has no right to kill, unless it be rendered necessary to prevent a felonious destruction of his property, or to defend himself against loss of life, or great bodily harm. If he kills when there is not a reasonable ground of apprehension of imminent danger to his person or property, it is manslaughter; and if done with malice, express or implied, it is then murder.

The rule as to the extent of protection to the dwelling being ascertained, there is but little difficulty in its application to the facts as stated upon the record. It is conceded most fully, that, if the evidence shows an assault upon the house, or the person, under circumstances which would create a reasonable apprehension—that is, a just apprehension in the mind of a reasonable man—of the design to commit a felony with force, or to inflict a personal injury which might result in loss of life or great bodily harm, the danger of the design being carried into execution being imminent and present, the person in whose mind such an apprehension is induced, and over whose person or property such danger is impending, may lawfully act upon appearances and kill the assailant. The law, in such a case, would not require that the danger should be real—that the peril should actually exist; but it does require that the appearances should be such as would excite a reasonable apprehension of such peril; and if such appearances do not exist, the killing would be either murder or manslaughter.

Assuming, therefore, that the deceased came to his death by the act of the prisoner, and by the use of a deadly weapon, and in the aspect of the case as presented by the charge requested, the question is simply whether the act was done under the necessity, real or apperant, which the law requires. If it was not, it follows necessarily that the prisoner was guilty either of murder or manslaughter; and if there was any evidence which tended to show that such necessity existed, the charge requested should have been given. Without referring to the evidence in detail,

it is sufficient to observe, that the bill of exceptions shows that none was offered of any act of violence on the part of the deceased, either in making the entry into the house, or after it had been made, unless the entry itself, after he had been warned not to enter, might be regarded as an act of violence. When the law speaks of a forcible trespass, it means such a trespass as would amount to a breach of the peace. Entering the house after a warning had been given, would have aggravated the trespass; but, if done without force, it would not have been a breach of the peace. The whole evidence, therefore, consisted of the previous threats made by the deceased, and the trespass committed by him. The threats, however, did not change the character of the trespass, and convert it into a trespass with force. We have seen that, although a forcible trespass upon the dwelling house may, in some cases, authorize the killing of the assailant, yet it is not every invasion even of this character upon a man's dwelling which will reduce the killing to manslaughter. The charge requested referred solely to the right of the prisoner to protect the possession of his house, and the circumstances, therefore, must tend to prove a reasonable apprehension on his part of the existence of such a state of facts as would relieve him from the crime of murder. Taken in connection with the evidence, then, the charge asserted the proposition, that where the evidence established only a trespass without force, it tended to create a reasonable apprehension, not only that it was committed with force, but under such circumstances as would be sufficient to reduce the killing to manslaughter. We think there was no error in the refusal of this charge.

In relation to the threats of personal violence made by the deceased towards the prisoner, which were excluded, we also think there was no error. The record shows they were not communicated to the prisoner, and we cannot therefore regard his action as having been influenced by them. But it is urged these were admissible to show the character of the conduct of the deceased in entering the house after he had been warned not to do so. The utmost that the threats could show in this aspect was, that the deceased entered the house of the prisoner with the intention of inflicting personal violence upon him, but the record does not show that any such violence was offered or attempted; besides, we are not informed as to the precise character of the threats,

and it is not every species of personal violence, even when offered against a man in his own house, that will reduce a homicide to the offence of manslaughter, when committed with a deadly weapon. Declarations of this character can, in general, only be received when they constitute part of the *res gestœ*, and as they were made a fortnight before the fact to which they were referred, were not admissible on this ground.

The only remaining question is, whether the court erred in its rulings in relation to the testimony of Goree. It is urged, on the part of the prisoner, that the objection to this evidence should have been sustained, for the reason that the question asked by the witness assumed his guilt, and was therefore calculated to entrap him. We have found no case which held that a question which assumed the guilt of the prisoner, was necessarily calculated to entrap him; and where that is not the case, we can perceive no sound reason for rejecting the evidence, upon the ground alone that the question in reply to which the confession was made, assumed the guilt of the party charged. The true test, we apprehend, is to ascertain whether the confession was made under circumstances which were calculated to render it untrue; and upon this principle, if it be made under the slightest inducement of hope or fear, excited by one having authority, it cannot be received. There may be questions so artfully put that the party to whom they are directed may, in answering them, not be aware of the effect of his answer; and, if admitted, it may be regarded as a confession when it was not intended as such by him; and this, we think, was the most that was meant by the dictum in the case of Mosler, 4 Barr 264. The case of Clarissa v. The State, 11 Ala. 57, is not authoritative on this point, as the decision was correct on the ground that the confession was made under the influence of the previous punishment the slave had received. In the case before us, we do not think the question was at all calculated to entrap the prisoner, and the objection on that ground is not tenable.

It is, however, insisted that the evidence should have been rejected, for the reason that neither the question nor the answer pointed directly to the commission of the offence. The question, it is true, did not refer in direct terms to the act with which the prisoner was charged; but we think that, under the circumstances, it could not properly have been referred to any other act.

We must presume, in the absence of evidence to the contrary, that the prisoner was possessed of ordinary intelligence, and if he was, the true import of the question addressed to him, after he had been committed for the murder of the deceased, by a person in whose custody he was, could not well have been misunderstood. We think it was sufficient to go to the jury, leaving its weight to be determined by them.

Neither do we think the court erred in overruling the objection either to the question or the answer, as to the manner of the prisoner. His answer to the question which preceded the one objected to, was of a character which rendered his manner, at the time it was said, very proper to go to the jury, for the purpose of determining the degree of weight to which his answer was entitled. If his manner had been that of the jester or buffoon, however unsuitable it would have been to the occasion, it might have diminished the weight that the jury would otherwise have attached to it. In the answer of the witness, we see nothing to object to. It used a term perfectly well understood, when applied to an answer, and was no more a conclusion than if he had used the word "quick," or "angry."

There is no error in the record, and the judgment is affirmed.