# Roberts *v.* The State.

### *Indictment for Murder.*

1. *Threats by deceased against accused; admissibility of.*—Threats made by the deceased against the defendant, whether communicated or not, are not admissible evidence for the defendant, unless it is shown that, at the time of the killing, the deceased was making some demonstration, or overt act of attack, in consummation of such threats, so as to raise the question of self-defense; but, where a case of self-defense is shown, evidence of uncommunicated threats, recently made, is admissible for the purpose of showing the *quo animo* of such demonstration or attack; so, also, evidence of uncommunicated threats is frequently admissible in corroboration of communicated threats which have been admitted; and where it is doubtful which party commenced the difficulty, evidence of such threats is admissible to show who was probably the aggressor. These views " are not in harmony with the former decisions of this court, but are in full accord with the doctrine established by the more recent cases of the highest courts of this country;" and, tested by these principles, evidence of threats in this case, communicated and uncommunicated, ought to have been admitted.

2. *Self-defense.*—The law does not require that a person, when attacked in his own house, shall retreat, nor does it require that the danger to life or limb shall be real, but authorizes him to act on appearances, when sufficient to create in the mind of a reasonable man a just apprehension of imminent danger to life or limb.

3. *Evidence of violent character of deceased.*—Evidence of the character of the deceased as a violent, dangerous, overbearing, or turbulent man, " is always admissible for the accused, where uncommunicated threats are received, and for the like purpose of illustrating the circumstances of the killing, and of qualifying, explaining, and giving point to such threats, as also to the conduct of the deceased at the time of the killing;" since a demonstration, or overt act of attack, made by such a man, may afford much stronger evidence of imminent peril to the life or limb of the person assailed, than when made by a person of an opposite character or disposition.

4. *Presumption of malice from use of deadly weapon.*—In cases of homicide, the law presumes malice from the use of a deadly weapon, and casts on the defendant the *onus* of repelling that presumption, unless the evidence which proves the killing shows also that it was perpetrated without malice; and whenever malice is shown, and is unrebutted by other facts, there can be no conviction for any degree of homicide less than murder.

5. *Grand jurors in Monroe and Wilcox, under special statute.*—Under the special statute approved February 13th, 1879 (Sess. Acts 1878-9, p. 204), the number of persons required to be summoned as grand jurors, in Monroe and Wilcox counties, was reduced to fifteen; and the record in this case shows with sufficient certainty, notwithstanding recitals informally entered, that the grand jury was organized with twelve of the persons originally summoned, and three others from the six talesmen.

6. *Objections to venire of petit jurors.*—Mistakes in the names, or in the initial letters of the names, of two of the persons specially sum-

[Roberts v. The State.]

moned for the trial of the defendant in a capital case, as copied in the list served on him, is not a sufficient ground for quashing the venire.

FROM the Circuit Court of Monroe.

Tried before the Hon. H. T. TOULMIN.

The defendant in this case, Charles Roberts, was indicted in October, 1879, for the murder of Duncan Rankin, by shooting him with a gun. Having been arraigned, the defendant moved to quash the indictment, "for reasons shown by the records of the court in the venire for the summoning of the grand jury for the October term of said court, 1879, and in the minute-entry of said term as to the formation of said grand jury at said term, and on these further grounds," specifying his several grounds, each of which alleged, in varying language, that the grand jury was illegally or irregularly organized, but did not state any facts showing wherein the defect consisted. "On the hearing of this motion, the defendant offered in evidence the venire for the drawing and summoning of the grand jury at said term, and the minutes of said term as to the organization and formation of said grand jury," which contained the following recitals : "It appearing to the court that the following named persons were drawn in conformity to law, previous to the commencement of this term of the court, and summoned as grand jurors for the Fall term, 1879, comprising the original venire, to-wit : 1, M. D. Perryman ; 2, S. H. Slaughter ; 3, J. D. Dubose ; 4, J. J. Simpkins ; 5, H. C. Johnson ; 6, R. A. Lambert ; 7, J. A. Rumbly ; 8, W. J. Robison ; 9, A. M. English ; 10, W. G. Riley ; 11, N. J. Stallworth ; 12, David Salter ; 13, J. H. Griffith ; 14, Daniel McNeill ; 15, W. H. Eubanks ; and, on being called, the following named persons answered to their names, and were in every respect possessed of the required qualifications of grand jurors, being registered voters, householders, and freeholders of said county, to-wit : 1, N. J. Stallworth ; 2, S. H. Slaughter ; 3, J. D. Dubose ; 4, J. J. Simpkins ; 5, H. C. Johnson ; 6, R. A. Lambert ; 7, W. J. Robison ; 8, W. G. Riley* ; 9, David Salter ; 10, J. H. Griffith ; 11, D. M. McNeill ; 12, W. H. Eubanks ; 13, Samuel Bussey ; 14, Malcolm McNeill ; 15, W. R. Lowery. And the said grand jurors were duly impanelled and sworn according to law, and charged by the court ; and N. J. Stallworth was appointed foreman of the grand jury, and William Smith was appointed bailiff, and sworn as such to attend on said grand jury during this term of the court ; who retired for the transaction of business. *And there not being present a sufficient number to complete the grand jury, the court ordered the sheriff to summon six competent persons ; out

[Roberts v. The State ]

*of which, Samuel Bussey, Malcolm McNeill and W. R. Lowery were duly drawn, and sworn in as grand jurors for this term of the court."* On the part of the State, the clerk of the court was examined as a witness, " to explain said minute-entry :" and he testified that the two cross-marks (* *) were intended to refer to each other, and that the words following the last mark, being the italicized words, should be inserted and read as if immediately following the name of *W. G. Riley.* The defendant objected to the witness being allowed to make any explanation of the minute-entry as it appeared of record, and also to the evidence given by him ; and he duly reserved exceptions to the overruling of these objections. On this evidence, the court overruled the motion to quash the indictment, and the defendant excepted. These proceedings were had at the October term, 1880, Hon. Jno. K. HENRY presiding.

At the May term, 1881, when the cause was called for trial, as the bill of exceptions states, " the defendant moved to quash the *venire* of jurors summoned to try said case, on the following grounds : 1st, that there has not been served on him such a list of the jurors summoned for his trial, including the regular jury, as is required by law and by the order of the court in this case ; 2d, that the list of jurors served on him by the sheriff, he being in actual confinement, did not include the regular jury impanelled for the week. On this motion, the defendant offered in evidence the list of jurors served on him by the sheriff, and the minutes of the court as to the impanelling of the petit jury at and for the present term," which are here set out in the bill of exceptions, "and showed to the court that then, at the time of making and arguing said motion, all and both of the regular juries for the term were then in court, and none of them were then engaged in the trial of any case; and the State then offered in evidence the original *venire* summoned by the sheriff, a copy of which was delivered to the defendant, with the indorsements and returns thereon," which are here set out. The only apparent discrepancies in the names contained in the two lists, as copied in the record, are these : the name of J. W. Northcut, one of the jurors for the term, is copied as J. N. Northcut in the list served on the prisoner ; and the name of N. E. Sermon, another juror for the term, is copied A. E. Sermon. If there were any other discrepancies, they are not apparent on the record, and they are nowhere specified. On this evidence, the court overruled the motion to quash the *venire,* and the defendant excepted.

As to the circumstances attending the killing, the evidence adduced by the State " tended to show that the defendant
VOL. LXVIII.

shot and killed the deceased within fifteen or twenty yards of the store of Slaughter & Rives; that the deceased, when he was shot, was in his shirt sleeves, approaching said store, and not making any demonstrations of any kind towards the defendant, and having no weapon of any kind in his hands; that on an examination of his body after he was shot, it was found that he had no arms or weapons of any kind about his person, except a small knife, which was closed and in his pocket; that in the month of August last, while the sheriff was bringing the defendant as a prisoner from Evergreen to Monroeville, defendant told W. C. Sowell that he was as afraid of the deceased as he was of a bear, and that he had made up his mind on Friday before the killing, which took place on Monday, to kill the deceased; that the deceased told him he must leave that part of the country; that the defendant shot the deceased through a window, near the front end of said store; that the sash was down, and he fired through the glass. It was shown, also, by the State, that said Rankin was cool and sober on the day he was killed, and showed no excitement; that the killing took place at Perdue Hill, in said county, where deceased and the defendant both lived; that no one but the defendant was in the store at the time of the killing; that the store faced north, and the deceased was shot from a side window towards the front of the store, while he was about fifteen or twenty yards north-east of it; that the shooting was done from the inside of the store, and out of sight of the deceased."

The defendant, it was shown, was a silversmith by trade, and his place of business was in the back part of the store of Slaughter & Rives. "The defendant offered evidence tending to show that, on the day of the killing, the deceased came to the said store three times—once early in the morning, the second time later in the day, and the third time still later; that when he came the second time he inquired for a pair of pants which he had left there, and got them from a clerk in the store; that on his third visit to the store he appeared to be excited, inquired if they had any kerosene oil, kicked off the lid of the kerosene-oil box, and said it was empty; that he went into the back part of the store, and looked around as if looking for something, and looked behind a hogshead, and behind a pile of sacks of salt, and walked out of the store; that this was in the evening of the day on which he was killed; that the defendant was in the store at the time, and one of the clerks, but no one else; that there was always one gun in the store, kept loaded, and sometimes two guns; that the defendant was at the store each time during the day when the deceased came, and aided in look-

[Roberts v. The State.]

ing for the kerosene oil; and that the deceased made no demonstration against him, and had no words with him on either occasion; and that the deceased, when he was shot, was walking towards the store, with his face towards it."

J. M. Slaughter, who was a brother-in-law of the deceased, testified, on behalf the defendant, " that some days before the killing, in his presence, the deceased threatened to kill the defendant if he would not leave the State; that he, witness, informed the defendant of these threats; that the deceased withdrew his threats on Saturday before the killing, and he (witness) informed defendant of such withdrawal, and told him he need have no fear of any attack; and that defendant still insisted he was afraid of the deceased. On motion of the solicitor, the court excluded this evidence; to which the defendant then and there excepted." The defendant then asked said witness several specific questions, as to threats made by the deceased against the defendant, and the communication of such threats to the defendant by him; but the court sustained objections to each of these questions, and the defendant duly excepted to each ruling.

" The defendant introduced one Martha Williams as a witness, and stated to the court that he expected to prove by her that, about one or two hours before the killing, she saw the deceased get his double-barreled gun and load it; that she heard his little son, while he was loading the gun, ask to go squirrel hunting with him, and heard him answer his son, 'that he was not going squirrel hunting, but was loading the gun to kill Roberts (the defendant), and that he or Roberts would be a dead man before night;' that she saw the deceased load his pistol about the same time; that this was done in the house of the deceased, which was not more than a quarter of a mile from the said store of Slaughter & Rives; that he put aside the gun and pistol after he had loaded them; that she went to the defendant, very soon afterwards, and told him that he had better look out for himself; and that the deceased was in the habit of going armed." With a view of eliciting this evidence as proposed, the defendant then asked said witness several specific questions, as to said threats and her communication of them to the defendant; but the court sustained objections to all the questions, and excluded the proposed evidence; and the defendant duly excepted.

" The defendant then offered to read the evidence of George Johnson, which was in writing, and had been admitted by the State, on an application by defendant for a continuance, subject to all legal objections and exceptions." The evidence was in these words: " That he, Johnson, was

[Roberts v. The State.]

well acquainted with the deceased for several years before his death, and knew his character, disposition, and habits; that he was a man very much given to be under the influence of spirituous liquors, and was a very turbulent, overbearing, vindictive, and dangerous man, and was very excitable and reckless, more especially when under the influence of liquor, but was also so when sober; that his general reputation was that he was a very turbulent, overbearing, vindictive man at all times, and more especially so when under excitement; that he was well acquainted with the general reputation of said deceased in the neighborhood in which he resided; that he was a man greatly to be feared, and much given to quarrels and personal difficulties." The State objected to this evidence, and the court sustained the objection; to which ruling the defendant excepted.

The court charged the jury, on the request in writing of the State, as follows : 1. "If the jury believe from the evidence, beyond a reasonable doubt, that the defendant killed Duncan Rankin by lying in wait, this would be murder in the first degree." 2. "When the killing is shown to be done with a deadly weapon, the law implies malice from the use of the weapon; and the burden of proof is upon the defendant to rebut this presumption, unless the evidence showing the killing itself shows there was no malice; and whenever malice is shown, either express or implied, there can be no conviction for any less offense than murder."

The defendant excepted to each of these charges, and requested the following charges, which were in writing, and which the court refused to give : 1. "The necessity which will justify the taking of life need not be actual, but the circumstances must be such as to impress the mind of the slayer with the reasonable belief that such necessity is impending." 2. "If the defendant, at the time he shot, believed that he was in danger of his life, or of great bodily harm from the deceased, though in fact he was mistaken, and was not in actual danger; yet, if he did so believe, and had reasonable grounds so to believe, the law may mitigate the crime from murder to manslaughter." The defendant duly excepted to the refusal of each of these charges.

S. J. CUMMING, for appellant.—1. The record shows that fifteen persons were summoned as grand jurors, as authorized by the special statute of force in Monroe and Wilcox counties, and it states that fifteen answered; while, of the fifteen persons named, three are not included among the number summoned. It is nowhere shown, except by inference, that any of those summoned failed to appear, or were

excused; and it is only by the aid of inference, or presump-
tion, that the conclusion can be reached, that the three per-
sons who were sworn as grand jurors, but whose names are
not included in the *venire*, were drawn from the talesmen.
The record should affirmatively show a compliance with the
statutory requirements, and its recitals can not be supple-
mented by the oral testimony of the clerk, nor aided by in-
ference, or presumption. ' If a necessity existed for comple-
ting the jury from the by-standers, they should have been
summoned from among the " qualified citizens of the county,"
while the order of the court was to summon six "competent
persons," which is not an equivalent term.—Code, § 4754 ;
*Finley v. The State*, 61 Ala. 201 ; *Couch v. The State*, 63 Ala.
163 ; *Weston v. The State*, 63 Ala. 155.

2. The *venire* of jurors summoned for the trial should have
been quashed, on the defendant's motion, because it was not
shown that a correct copy thereof was served on him. A list
of persons was served on him, said to have been summoned
"for Thursday, May 5th, 1881;" but this does not purport
to be a list of the persons summoned as jurors for his trial,
nor does it appear that he was informed such was the fact.
If this list was a copy of the *venire* summoned as jurors, it is
not a compliance with the statute, which requires that the
regular jurors for the week shall be included; while the
names of J. N. Northcut and N. E. Sermon, two of the regu-
lar jurors, are not included in the list.—Code, § 4872 ; *Nutt v.
The State*, 63 Ala. 180.

3. The court erred in excluding the evidence of threats
made by the deceased against the accused. All of these
threats, as proposed to be proved, were communicated to the
defendant before the killing ; and the threats proposed to be
proved by Martha Williams, being communicated only an
hour or two before the killing, were admissible on the prin-
ciple of *res gestœ*. If a demonstration, or overt act on the
part of the deceased, was necessary to render proof of pre-
vious threats admissible, it is insisted that the approach of
the deceased to the store in which the defendant was at work,
in connection with the other facts in proof, was a sufficient
demonstration, or overt act. The store was the habitation of
the defendant, from which he was not required to retreat;
and he might lawfully act upon appearances, although the
deceased was in fact unarmed.—1 Greenl. Ev. § 108 ; *Oliver v.
The State*, 17 Ala. 598; *Noles v. The State*, 26 Ala. 31 ;
*Pritchett v. The State*, 22 Ala. 39 ; *Rogers v. The State*, 62
Ala. 170; *Dotson v. The State*, 62 Ala. 141 ; *Carroll v. The
State*, 23 Ala. 28 ; East's P. C. 271-2. See, also, the cases of
*Bohannon*, *Rector*, and *Bond*, in Horr. & Thompson's Cases

[Roberts v. The State.]

of Self-Defense, pp. 395, 795, 814; and Grainger v. The State, 5 Yerger, 459.

4. The character of the deceased, as a violent, quarrelsome man, was very material to the inquiry whether the defendant acted under a sense of imminent danger, or was justified in acting on appearances.—Cases above cited.

H. C. TOMPKINS, Attorney-General, for the State.—1. The minute-entry showing the organization of the grand jury, though very informal, shows a substantial compliance with all the requisitions of the statute; twelve of the original venire being sworn, and the remaining three jurors drawn from the six talesmen, who, "if competent persons," were necessarily qualified citizens of the county.—Yancey v. The State, 63 Ala. 141.

2. The motion to quash the venire of special jurors was properly overruled, because it was too general and indefinite, no specific objection being pointed out. The only discrepancy apparent on the record, between the venire and the list served on the defendant, was in the initial letters of two names, which was no ground for quashing the venire.—Code, § 4876; 62 Ala. 248.

3. Evidence of threats made by the deceased, and of his character as a dangerous man, is governed by the same rule. Such evidence is only admissible, when there was, at the time of the killing, some hostile demonstration, or overt act of attack on the part of the deceased, and apparent imminent danger to the accused; in other words, when a case of self-defense is shown.—Wharton's Crim. Ev. §§ 84, 757; Pritchett v. The State, 22 Ala. 39; Payne v. The State, 60 Ala. 80; Kendrick v. The State, 55 Ala. 436; Holly v. The State, 55 Miss. 424; Myers v. The State, 33 Texas, 525; Eiland v. The State, 52 Ala. 322; Alexander v. The State, 66 Mo. 162.

4. The charges of the court were correct.—Hadley v. The State, 55 Ala. 31; Mitchell v. The State, 60 Ala. 26; Murphy v. The State, 37 Ala. 142; Head v. The State, 44 Miss. 753.

SOMERVILLE, J.—The former rule was, that uncommunicated threats, in cases of homicide, made by the deceased against the accused, were not competent evidence for the latter, unless they constituted a part of the res gestœ.—State v. Carroll, 23 Ala. 28; Clark's Man. Cr. Law, p. 63, § 396. In Burns v. The State, 49 Ala. 370, this was laid down as the general rule, liable to certain exceptions. There is, however, apparent in the more recent cases a decided modification of this doctrine, greatly favorable to the admission of such evi-

[Roberts v. The State.]

dence, in many instances where it was formerly excluded. *Wiggins v. The People,* 3 Otto (93 U. S.), 465.

It is an important and well-settled principle, in the first place, that no threats previously made by the deceased, whether communicated to the defendant or not communicated, are admissible in trials for homicide, unless it appears from the testimony that, at the time of the killing, the deceased had sought a conflict with the accused, or was making some demonstration, or overt act of attack, towards the accomplishment or perpetration of such threats.—*Myers v. State,* 62 Ala. 599; *Evans v. State,* 44 Miss. 762; *Payne v. State,* 60 Ala. 80. In other words, the circumstances in evidence must properly raise a case of self-defense. Where this is so, evidence of uncommunicated threats, *recently* made, are admissible, for the purpose of showing the *quo animo* of such demonstration, or attack.—Whart. Cr. Ev. § 757; *Eiland v. State,* 52 Ala. 323; *Stokes v. State,* 53 N. Y. 164; *State v. Turpin,* 77 N. C. 473; *State v. Hays,* 23 Mo. 287; *Keener v. State,* 18 Ga. 194; *Campbell v. People,* 16 Ill. 17; Horr. & Thomp. Cas. Self-Def. 927; *Pritchett v. State,* 22 Ala. 39. So, uncommunicated threats are frequently admitted, for the purpose of *corroborating* those that are communicated, and which have already been admitted in evidence.—*Haller's case,* 37 Ind. 57; Whart. Cr. Ev. § 757. And, likewise, where it is doubtful, from the testimony, which party commenced the affray, threats of this character are admissible, as in the nature of facts, to show who was probably the first assailant.—*Scroggins' case,* 37 Cal. 677; Whart. Cr. Ev. § 757.

Whether such threats, taken in connection with the circumstances of the affray leading to and accompanying the killing, are sufficient to justify the act of homicide, is a question of fact for the jury, and it is not permissible for the court to determine it as a matter of law. They cannot be excluded, if there is the slightest evidence tending to prove a hostile demonstration, which can be reasonably interpreted as placing the accused, at the time of the killing, in apparent imminent danger to life, or of other grievous bodily harm.—*Pridgen v. State,* 31 Tex. 420; Horr. & Thomp. Cases Self-Def. 416.

The evidence here tends to show that the deceased was a "very turbulent, overbearing, and vindictive man at all times, and more especially so when under excitement." It also tends to prove that he made violent threats against the accused, within one or two hours before the killing, at which time the deceased loaded his gun, announcing his intention to kill the accused before night. These threats were ad-

[Roberts v. The State.]

missible, we think, under all the circumstances, to show the *quo animo* of the deceased in soon afterward going to the store which was the habitation of the accused, and from which the law did not require that he should retreat. If all the facts of the case were sufficient to create a just apprehension, in the mind of a reasonable man, of imminent danger to the life or limb of the accused, he could lawfully act upon appearances, and kill his assailant. It was not necessary that the danger should be real.—*Carroll v. State*, 23 Ala. 28; Clark's Cr. Digest, § 490, and cases cited.

The character of the deceased as a violent, dangerous, overbearing, or turbulent man, was also admissible evidence for the accused. Such evidence is always admissible, where uncommunicated threats are received, and for the like purpose of illustrating the circumstances of the killing, and of qualifying, explaining and giving point to such threats, as also to the conduct of the deceased at the time of the killing. *Eiland v. State*, 52 Ala. 323; *Bowles v. State*, 58 Ala. 335; *Fields v. State*, 47 Ala. 603. A demonstration, or overt act of attack, made by such a one, may afford much stronger evidence that the life or limb of the person assailed was in imminent peril, than if performed or made by one of an opposite character or disposition. Hence, it would reasonably justify a resort to more prompt measures of self-preservation.—*Pritchett v. State*, 22 Ala. 39; *Stokes' case*, 53 N. Y. 164. A man's character in this respect may be so violent, as that he may be a walking menace to the community in which he resides.

These views, as to the admissibility of threats, are not in harmony with the former decisions of this court, but are, as we think, in full accord with the true doctrine, as established by the more recent cases of the highest courts in this country. Whart. Cr. Ev. § 757; *Rogers v. State*, 62 Ala. 170; *Carroll v. State*, 23 Ala. 38; Cases of Self-Def. (Horr. & Thomp.) 927, 531, 539.

The Circuit Court erred in refusing to admit the evidence of the bad character of the deceased for violence, and of the threats, communicated and uncommunicated, made by him against the accused.

In *Dupree's case*, 33 Ala. 380, no demonstration by the deceased was proved, except that he ran towards the accused, apparently unarmed. A character for violence having been proved against him, communicated threats were admitted, as indicating an angry and revengeful spirit towards the prisoner, and a determination to do violence to his person.

In *Carroll's case*, 23 Ala. 28, there was no proof of a violent or turbulent character on the part of the deceased, and

[Roberts v. The State.]

uncommunicated threats by the latter against the accused were excluded, when introduced to show that the mere entry of the deceased on the premises of the prisoner was made with intent to inflict personal violence. The action of the court was put upon the ground, that the record showed no offer of violence, and that the precise character of the threats was not disclosed.

Where the character of a man is notoriously turbulent and bloodthirsty, and his threats are brutal, ferocious, and recently made, his armed entry upon the premises of his assailant might readily be inferred by a jury as being of so hostile a character as to place such assailant in imminent danger. If, however, his character be that of a peaceful and quiet man, or the threats be not recent, nor at all vindictive nor specific, or he be unarmed, and his approach be apparently not hostile, the conclusion of the jury might reasonably be the reverse.—Whart. Cr. Ev. § 69.

There doubtless are cases, where one has a right to anticipate his adversary, and is not compelled to stand still and wait for an advantage to be taken of him, in an emergency rendered imminently dangerous by complicated surroundings. But these cases are rare, and the right is not to be too readily inferred by juries. If the danger is not apparently imminent, which would reasonably justify a resort to it, the assailant does so at his own hazard. His own personal fear, or timid cowardice, will not excuse his undue precipitation of action. If he lie in wait, and take the life of his adversary, without an impending necessity, which imperiously requires such act for the prompt preservation of his own life, he is guilty of murder, and cannot complain at suffering the just penalty of the law. No mere threats, however violent or vindictive, will justify the shooting of their author on sight, unless he be at the time engaged in some overt act, or demonstration, such as we have above described.— *Grainger v. State*, 5 Yerg. 459; 26 Amer. Dec. 278, and *note* 280; *Lewis v. State*, 51 Ala. 1; *Eiland v. State*, 52 Ala. 322; *Mitchell v. State*, 60 Ala. 26.

It is a principle, many times announced by this court, that, in cases of homicide, the law presumes malice from the use of a deadly weapon, and casts on the defendant the *onus* of repelling the presumption, unless the evidence which proves the killing shows also that it was perpetrated without malice.—*Hadley v. State*, 55 Ala. 31; *Murphy v. State*, 37 Ala. 142. And whenever malice is shown, and is unrebutted by circumstances of the killing, or by other facts in evidence, there can be no conviction for any less degree of homicide than murder.—Clark's Man. Cr. Law, § 469.

The objection to the organization of the grand jury was not well taken. By the act of February 13, 1879, the number of grand jurors for the county of Monroe and other counties was reduced to fifteen persons.—Acts 1878-79, p. 204. It sufficiently appears from the record, we think, that twelve jurors were selected from the original *venire*, and that three more were drawn and added from the six new names selected to complete the grand jury.

The defect in the names of two of the jurors, as found on the list served on the defendant, was no legal ground for a motion to quash the *venire*.—Code (1876), §§ 4872, 4876; *Kimbrough v. State*, 62 Ala. 248; *Floyd's case*, 55 Ala. 61. The names could have been discarded, on motion by the defendant, and other jurors summoned in their stead.—Clark's Cr. Digest, § 567, and cases cited.

The above views cover the principles involved in the charges given and refused by the court, the correctness of which can be easily determined without reference to them in detail.

The judgment of the Circuit Court is reversed, and the cause remanded. In the meanwhile, let the prisoner be retained in custody, until discharged by due course of law.