# Perry *v.* The State.

*Indictment for Murder.*

1. *Homicide in self-defense; duty to retreat.*—To justify the taking of human life on the ground of self-defense, it must appear that the defendant did not begin or provoke the difficulty, that he retreated as far as he could with safety, or that he could not retreat without increasing his apparent danger; unless he brings himself within the principle of protection given by the law to a person who is attacked in his own house or place of business.

2. *Same; protection of dwelling-house, or business office.*—The defendant being engaged, when assailed by the deceased, in hitching up his employer's horse and buggy, in an open space in front of the stable, can not claim the immunities and legal privileges which the law extends to the actual or business residence, because he was in his proper place, and in the discharge of his regular duties. It was

his duty to retreat, if retreat was practicable, or would not increase his apparent peril. Yet he was not required to leave his business on a mere fear or apprehension of an attack, or even a threat by the deceased, but might arm and prepare himself for defense against such apprehended or threatened attack, and await developments.

3. *Right of defense against attack, as affected by character of assailant.* The character of the assailant, as a violent and dangerous man, does not justify the taking of his life, nor even palliate the offense; yet proof of it is admissible, and should be weighed by the jury in determining the extent of danger, and the practicability of retreat; since a demonstration, or overt act on the part of such a person, may afford much stronger evidence of imminent peril, and justify a resort to more prompt measures of self-preservation, than when the assailant is of different character.

FROM the Circuit Court of DeKalb.

Tried before the Hon. JOHN B. TALLY.

The defendant in this case, Albert Perry, was indicted for the murder of Lee Williams, by shooting him with a gun; was convicted of manslaughter in the first degree, and sentenced to the penitentiary for the term of seven years. Both of the parties were freedmen, and were in the employment of the sheriff of the county; the defendant being employed as hostler, and the deceased as cook, and also having charge of the cows. The difficulty between them occurred one morning after breakfast, while preparations were being made for the funeral of the sheriff's mother, who had died at his house during the preceding night. The defendant was engaged in hitching up the buggy, while the deceased was in the stable lot attempting to milk the cows, which became restive and would not stand, and he threw the bucket at them. Just at this time, the defendant went into the stable, or lot, and told the deceased he would have no trouble with the cows if he would feed them, to which the deceased replied with very abusive words; but the evidence was conflicting as to whether the defendant spoke first, or in reply to an inquiry by the deceased as to what he was doing there. The deceased walked away towards the sheriff's office, and the defendant ran to his cabin, returning with his gun in his hand; but he set it down by the buggy, at the instance of one Shankles, a white man who was standing near, and who told him to go on with his work. The deceased returned while the defendant was putting the harness on the horse, opened the gate with his left hand, drew from his pocket a pistol which he had procured in the sheriff's office, and as he pushed aside the head of the horse, which stood between him and the defendant, the latter shot and killed him. These were the main facts, though in several particulars there were discrepancies in the testimony.

The defendant requested the following charges in writing,

[Perry v. The State.]

and duly excepted to their refusal: (1.) "The law does not require a man to retreat from his dwelling-house, and his place of business for this occasion, *pro hac vice*, is his dwelling-house." (2.) "If one has reasonable apprehension of great personal violence, involving imminent peril to life or limb, he has the right to protect himself, even to the extent of taking another's life, if such protection can not be otherwise secured." (3.) "If the jury find from the evidence that Albert Perry used all the means in his power, consistent with his safety, to avoid the danger, before he fired at Lee Williams, and was not in fault in bringing on the difficulty, then they must acquit him." (4.) "If, under the evidence in this case, the jury find that there were such acts as to create in the mind of a reasonable man [a belief?] that there was great danger to his life, or danger of his suffering great bodily harm; then the defendant was not forced to retreat, but might take the life of Lee Williams, if he was not himself in fault in bringing on the difficulty." (5.) "Retreat is not required when the assault is made with a deadly weapon." (6.) "If the jury believe from all the evidence that Albert Perry was lawfully and peaceably engaged in hitching up the buggy of Sheriff Frazier, and while so engaged Lee Williams rushed upon him with a deadly weapon; and that Perry had reasonable cause to believe that he was in danger of losing his life, or of receiving great bodily harm at the hands of said Williams; and that said danger was imminent, and said Perry was without fault on his part; then Perry had the right to strike in self-defense, and, if apparently necessary under all the circumstances, for his own protection, to take the life of his assailant, he would have the right to do so." (7.) "If the jury believe from all the evidence that Perry was lawfully and peaceably engaged in hitching up the sheriff's buggy, and while so engaged Lee Williams rushed upon him with a deadly weapon; and that Perry believed, and had reasonable ground to believe, that he was in danger of losing his life, or of receiving great bodily harm from said Williams,—then he had the right to strike in self-defense." (8.) "If the jury believe from the evidence that Perry was at Mr. Frazier's house, in the rightful discharge of his work, and that he did nothing to foster or bring on the difficulty with Williams; then the mere fact of his going to his house and getting his gun would not, of itself alone, and with no act or demonstration of using it until he was forced to do so by the act of Williams, take from him the right to shoot in self-defense, if he could not have escaped danger by retreating." (9.) "The defendant, if the jury find that he went home and got a gun, had a right to peaceably return and

[Perry v. The State.]

hitch up the horse, and had the right to bring with him a gun for protection only." (10.) "If the jury believe that Perry went to his house and procured a gun, and in so doing was not actuated by any motive of preparing himself to commence or enter upon a difficulty with Lee Williams, but solely for the purpose of being prepared to protect himself from an attack there was a reasonable apprehension would be made upon him, and which would endanger his life, or put him in danger of receiving great bodily harm; and that Perry then returned to continue in a peaceable manner the performance of the service for the sheriff in which he was engaged; and that after he returned he did nothing to renew a former difficulty, or to bring on or provoke a difficulty with Williams; then, the mere fact that he had gone to his house, armed himself, and returned to his work, would not deprive him of the right of self-defense." (11.) "While the law requires that Albert Perry should be in a situation of either real or apparent danger to life, or of receiving grievous bodily harm, and that the danger was imminent, and that he should be himself reasonably free from fault, before he would be justified in shooting; yet the law only requires that he should exercise his reason—should act as a reasonable man would have acted under the circumstances; and if, under those circumstances, a reasonable man would have believed that he was in danger of losing his life, or of receiving great bodily harm, and that such danger was then impending, and said Perry did so believe, and was not the aggressor in the difficulty, and was reasonably free from fault,—then he had a right to defend himself, even to taking the life of Lee Williams."

L. A. DOBBS, for appellant.

WM. L. MARTIN, Attorney-General, for the State.

STONE, C. J.—The law must and does place a high estimate on human life, and the circumstances must be exceptional to excuse its being taken, otherwise than in punishment of some crime which the law itself has made capital. Hence it is that, when life has been taken, not in obedience to some judicial sentence, the law raises the presumption that it was feloniously taken, unless the testimony which proves the killing, proves also the excuse or extenuation. Hence it is that, when a homicide is proved, and the criminating proof fails to disclose the excuse or extenuation, the law-imputed, felonious guilt attaches, and the burden is cast on the defendant to rebut or repel such imputation. Hence it is that

one who begins, or provokes a difficulty, can not invoke the doctrine of self-defense, unless he clearly retires from the combat, and, by word or deed, manifests a desire and intention to be at peace. Hence it is that, when one is menaced or assailed, not in his own dwelling, he must escape by flight, if he can do so safely, and without increasing his apparent danger.—*Clements v. State,* 50 Ala. 117; *Roberts v. State,* 68 Ala. 156; *Sylvester v. State,* 71 Ala. 17; *De Arman v. State, Ib.* 351; *Ex parte Warwick,* 73 Ala. 57; *Wharton v. State, Ib.* 366; *Ex parte Brown,* 65 Ala. 446; *Bain v. State,* 70 Ala. 4; *Ingram v. State,* 67 Ala. 67; *Jones v. State,* 76 Ala. 8; *Cary v. State, Ib.* 78.

The defendant and the deceased were, each of them, servants in the employment of the same person—the sheriff of the county. Defendant was hostler. Aside from the testimony of the defendant himself, there is a want of clearness of proof as to the origin of the quarrel. One phase of the proof was, that the deceased first insulted the defendant with approbrious words, and with threats; that thereupon he, deceased, went into the sheriff's office, and came out towards where the defendant was, having in his hand the sheriff's pistol, and was in this condition advancing on the defendant, who was in his proper place in front of the stable, harnessing and hitching up his employer's horse; that he advanced, with pistol in hand, near to the defendant, but on the opposite side of the horse, and while pushing the horse's head aside, the defendant snatched up his gun and fired, killing him. This phase of the testimony tends to show that, about the time deceased went after the pistol, defendant went a short distance, and returned with his gun, which, at the suggestion of a by-stander, he set down by the buggy, and returned to the service of harnessing the horse; and that he was thus employed when the deceased approached on the opposite side of the horse. This phase of the testimony leaves it a question for the jury to determine, whether the deceased first went for the pistol, or indicated such intention, or whether defendant first went for his gun. The testimony was that deceased was a violent and dangerous man. We have given only one phase of the testimony. Other testimony gave a different version. It is the province of the jury to determine the facts.

Certain legal principles become important, if the foregoing phase of the testimony be found to be true. The difficulty taking place in an open space in front of the stable, that place was not entitled to the immunities and legal privileges the law accords to the actual or business residence. It was the duty of the defendant, if he was approached in a dangerous

and threatening manner, to retire and escape from the conflict, if he could do so without danger to himself. If by flight he would apparently increase the danger to his own life, or if by the attempt he would apparently leave himself exposed to grievous bodily harm, from which he could not probably escape by flight, and if he was free from fault in bringing on the difficulty, then he could stand his ground and defend himself, even at the expense of his assailant's life. The law does not require that one who is without fault, shall lose his own life, that he may thereby spare that of his assailant. We are not commanded to love our neighbor better than ourself.

There are other aspects of this question which the phase of the testimony we are considering presents. The testimony is undisputed, that deceased was a man of violent and dangerous character. Now, while that fact did not of itself justify the taking of his life, or even palliate the offense, yet it was permissible to make proof of it, and such proof should be weighed by the jury in determining the extent of danger, if any, to which defendant was exposed, and his means and opportunity of safe escape therefrom by flight. "A demonstration, or overt act of attack, made by such a one, may afford much stonger evidence that the life or limb of the person assailed was in imminent peril, than if performed or made by one of an opposite character or disposition. Hence it would reasonably justify a resort to more prompt measures of self-preservation."—*Roberts v. State*, 68 Ala. 156.

The testimony tends to show that defendant was in his proper place of business. He had a right to be there, if this testimony be true. He was not required to leave his place of business, upon a mere belief or apprehension, or even threat, that deceased contemplated doing him grievous bodily harm. And if threatened by words or hostile demonstration, he violated no law if he prepared himself for defense, and *only for defense*, against such threatened, dangerous attack. His duty to leave his employment and escape by flight, if apparently practicable, would not arise in such conditions on mere apprehension of attack. He could safely prepare, and await developments. If, however, when approached menacingly, not being within his dwelling, there was apparently reasonable opportunity for safe escape by flight, then it would be and was his duty to so escape. This, because of the law's imperative command, that human life shall not be taken, unless there is a present necessity, real or apparent, to strike in defense of one's own life. All these defensive rights, however, are hinged on the condition, that the party resorting to them must be free from fault in provoking, or bringing on the difficulty.

[Bibb v. The State.]

Of the charges asked by defendant, the first was abstract, and was rightly refused on that account. Charges 2, 3, 4, and 5 pretermit all inquiry of defendant's fault in bringing on the difficulty, and for this reason were faulty. Charges 6 and 7 omit all inquiry of reasonable means of escape by flight, and for that reason were rightly refused. Charge 8 postulates, *as a fact*, that defendant did no act, and made no demonstration of an intention to use the gun, until he was forced to by the act of the deceased. One phase of the testimony may have justified this, but the whole testimony taken together did not. Charge 9 ought to have been given. Charge 10 would be faultless, if the words "after he so returned" were omitted. So, if the word "reasonably" had been omitted from the latter part of charge 11, it would be free from error.

Reversed and remanded.