### WRIGHT v. SOUTHERN EXP. CO.

(Circuit Court, W. D. Tennessee, W. D. March 30, 1897.)

No. 3,397.

1. NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.
   A new trial will not be granted upon the ground of newly-discovered evidence, where the party making the application had heard rumors which, if followed up, would have led to the discovery of the evidence before the trial, or where the new evidence would be merely cumulative.

2. INSANE PERSONS—COMPETENCY AS WITNESSES.
   Where one who has been adjudged to be insane is offered as a witness, the inquiry for the court on the preliminary examination is limited to his understanding of the obligations of an oath and ability to comprehend the examination as a witness, and, if he can stand this test, the effect of his alleged insanity upon his credibility is for the jury.

3. SAME—NEW TRIAL.
   Where there can be no doubt, from what occurred at the trial, that a witness who had been adjudged to be insane would have stood the test

of any examination as to her sense of the obligation of an oath, the court will not grant a new trial merely because there was no such preliminary examination.

4. TRESPASS—USE OF FORCE TO PREVENT.

One who is a trespasser undertaking to carry away the property of another cannot complain if the owner lays hold of the property and takes it from him, provided excessive violence is not used; and this is true even though the taking away might have been prevented by detaining the trespasser without the use of any violence or physical force.

5. PRACTICE—INSUFFICIENCY OF EVIDENCE TO SUPPORT VERDICT.

It does not follow, because a case ought to be submitted to a jury, that the court should let the verdict stand; and while the time might come when it would be the duty of the court to yield even to the perversities of the jury, and not any longer interfere with their verdict, two verdicts are not ordinarily conclusive of that duty.

6. SAME.

In actions to recover damages for personal injuries, the court should exercise the right of inspection of the verdict more readily and freely than in other classes of cases, where the occasion for its exercise does not so often arise; and where the alleged injury is hidden, and the plaintiff depends largely for success upon the bare opinions of medical men employed by him as expert witnesses, the court should be more vigilant than where the injury is obvious.

## Action by Florence H. Wright against the Southern Express Company.

This is an action for damages for personal injuries alleged to have been sustained in a struggle between the plaintiff and the defendant's agent over a parrot in its cage, constructed of wooden strips tacked together with nails, such as is commonly used in shipping birds. It had come from Nicaragua, consigned by a brother to his sister, Mrs. Williams. The plaintiff, being a sister of the consigner and consignee, had heard, according to her story, that the bird was to be sold for charges, delivery to the consignee having been delayed by her absence. The plaintiff, appearing at the express office, proposed to buy the bird. Parleying ensued, which resulted in her paying the amount of the charges, executing a receipt on the delivery book, and the consequent delivery to her then and there. She laid her hands upon the cage to send it away by her servant, accompanying her, when the agent was warned by a bystander that the plaintiff was taking the bird as her own through a pretended purchase from him, contrary to his understanding of the transaction, according to his contention, and contrary to the bystander's notion of the agent's right to thus dispose of the bird. Anticipating trouble for himself and his company, the agent forbade the plaintiff to take away the bird, laid his hands upon the cage to prevent her from delivering it to her servant, and thereupon the struggle for its possession ensued. Upon the facts proved, the court peremptorily instructed the jury that the plaintiff was a trespasser and a wrongdoer, or else should have yielded a ready assent to the rescission of the supposed purchase from the agent for the correction of the mutual misunderstanding between them, and left the bird in the express office; that the agent had a right to retain it in the office, and to use such force as was necessary to accomplish that purpose; but that the defendant company would be liable for any unnecessary or excessive violence in defending his possession. Having received such other instructions as the case required, the jury returned a verdict for the plaintiff, assessing the damages at $3,500. There had been a previous trial of the case, Mr. District Judge Clark presiding, and also a verdict for the plaintiff for $2,500. The instructions in that case proceeded upon a somewhat different theory of trying the case, not being confined, as in this trial, to the question of excessive violence. That verdict was set aside, and a new trial granted, mainly upon the ground that the evidence did not make it reasonably cer-

tain that the plaintiff had been injured by the struggle in the express office. The defendant, upon this present motion for a new trial, filed an affidavit of newly-discovered evidence, as follows:

"Florence H. Wright versus Southern Express Company.

"In this case G. W. Agee makes oath that he was, when this suit was instituted, and ever since has remained, the superintendent of the Western division of the Southern Express Company, and that as such officer it has been his duty to look after this lawsuit and see to its defense; that he has been actively engaged in its defense since the suit was instituted, and has attended to the preparation of the case for trial and to the two trials which have been had in said case. He further states that during the last trial, in December, 1896, and not until then, did he discover that the plaintiff, Florence H. Wright, had been regularly committed to an asylum for the insane at Utica, N. Y., upon the certificate of Drs. John de Vello Moore and William J. Schuyler, legally qualified examiners in lunacy, approved by the Honorable W. T. Dunmore, judge of Oneida county, New York, this application for commitment to the insane asylum having been made by Miss Florence Wright, of Utica, N. Y., a daughter of said plaintiff, and her brother, Rev. B. F. Cossitt, of Waterville, Oneida Co., N. Y.; and that she had remained there in the insane asylum as a patient from September 11, 1895, until December 11, 1895, when the said Mrs. Florence H. Wright was allowed to leave the hospital for the insane on parole of thirty days, and at the expiration of thirty days she was entered on the books of said asylum as 'Discharged, unimproved.' He further states that soon after the plaintiff left the Utica Insane Asylum, unimproved, that she came to Memphis, Tenn., and this case was brought up for trial in February, 1896, about two months thereafter, at which time the plaintiff was, as he understands the facts, undoubtedly of unsound mind. He further states that he is thoroughly satisfied that she has not recovered from the mental disorder, and that she still was insane, at the time of the last trial, and still is insane; that upon a new trial of the case the defendant will be able to show by the testimony of Dr. G. Alder Blumer, superintendent Utica State Hospital for the Insane, Utica, N. Y., that the plaintiff was and is now afflicted with an incurable mental disorder rendering her insane, and which would either disqualify her as a witness or materially weaken any testimony given by her in this case. Upon the last trial of this case the defendant was not able to make this proof, as it was not aware of the fact that the plaintiff had been committed to an asylum for the insane, and only discovered the fact when a witness in the case, during the progress of the trial, showed defendant's counsel a letter from Dr. Blumer, stating these facts, and it was then too late to obtain the presence of witnesses at the trial or secure his deposition. He further states that he does not know of any negligence or want of care upon his part, or that of any officer of his company, or its counsel, that this fact was not known. In support of the above statement of facts he attaches hereto correspondence which he has had with Dr. Blumer, which correspondence will verify the facts above stated, all of which he respectfully submits to the court. He further states that this application is not made for the purpose of delay, but to the end that justice may be done.
        "[Signed]                              G. W. Agee."

The two attorneys of the plaintiff filed their affidavits in the absence of their client, which indicate that she herself will swear that she had been unjustly placed in an insane asylum, and had been released therefrom by habeas corpus; that there had been no formal adjudication of her insanity, but an examination by medical men for the purpose of transferring her from a sanitarium or hospital to the asylum; that while the full extent of the information possessed by the defendant company and its counsel before the first trial and before the second trial is not known to affiants, they do know, from conversation with the counsel of the defendant company, that they had some information or had heard some rumor that the plaintiff had been in an insane asylum; and that they were informed by the testimony of Bishop Gailor, and other clergymen having knowledge of the plaintiff, that

she was suspected of being insane. It is not necessary to give these affidavits in full, nor to await the filing of the plaintiff's affidavit, because there is no doubt of the fact that the defendant company and its counsel all the time have had intimations or suspicions of the plaintiff's insanity. They questioned her on the trial about her having been in sanitariums or hospitals, though not upon the subject of her having been confined in an insane asylum or adjudicated insane.

The testimony as to the injury of the plaintiff consisted of her own description of her physical and mental sufferings, and that of medical men who had attended her or examined her, some of them for the purpose of giving their evidence, and some for purposes of treatment. Witnesses testified as to her condition of health, her habits and conduct of life, before and since the occurrences at the express office. This testimony was met by the defendant company with the testimony of medical men speaking to a hypothetical case, or men who had examined her while under treatment, and especially the physician who treated her at home after the altercation at the express office, and such other witnesses as could speak of the plaintiff's physical condition, habits of life, and conduct. Among other incidents of her life, it appeared that she had some years before been thrown from a carriage, and received serious injury affecting her spine, for which she had in the intervening time been often treated. Her own proof, and that of her medical men, was that she had recovered from this injury, she producing, among other testimony, that of a New York physician who had certified to her good health in aid of her application to become a member of the Episcopalian Order of Deaconesses. Around this old-time accident, and the conflict over the bird at the express office, the testimony of the plaintiff was gathered to show that she had entirely recovered from the previous injury, and that all her pain and sufferings were attributable to the violence of the struggle with the defendant company's agent; and on the part of the defendant to show that she had never been a well woman, had never recovered from the former injury, was not at all injured by the quarrel over the bird and cage, and that she was a physically frail woman, with mental disorders that made her irascible, quarrelsome, and unreasonable in her conduct towards other people. There was a motion by the defendant company to direct a verdict, both at the end of the plaintiff's testimony and at the end of all the proof, which motion the court refused to grant, but submitted the case to the jury as hereinbefore indicated.

J. H. Watkins and E. E. Wright, for plaintiff.

Geo. Gillham and F. G. Dubignon, for defendant.

HAMMOND, J. (after stating the facts).    Being dissatisfied with the verdict, which on the proof was not expected by the court, and at the same time seriously averse to interfering with the right of trial by jury merely because the court is disappointed by the verdict, the ground of newly-discovered testimony offers a plausible and somewhat tempting excuse to direct a new trial.    If, however, that were the only ground, it would be refused, for the proof offered does not at all justify a new trial for that reason, when we carefully scrutinize it.    It may be doubtful if there has been any judicial adjudication of the plaintiff's insanity, and probably it was only an administrative determination, with judicial sanction, as between hospitals.    The affidavits do not disclose the facts with sufficient fullness to exhibit the technical character of the proceeding; but, suppose there were an adjudication as upon a writ de lunatico inquirendo, it ought to have been produced at the trial. Due diligence is required in all cases, and testimony is not newly discovered, in the sense of the law of new trials, merely because the party did not know of it at the time.    There must be more than

this, and it must appear that by due diligence it could not have been discovered, or, rather, that after due diligence it had not been discovered, in time for the trial. There was known to be a question about the plaintiff's sanity, and the fact that it was rumored that she had been in an asylum was well known to the defendant company. It was contented with such proof as was given at the trial, and did not, as it should have done, follow up the plaintiff's life, and discover, as could easily have been done, the facts about the confinement in an asylum; the proceedings, judicial or other, upon which it was had; her release on habeas corpus, if such were the fact; the nature of her malady, and all there was or is concerning it. That this was not done is obviously a want of due diligence, because, in the very nature of it, the facts could not be concealed from ordinary inquiry in and about the places where she had been, and of the persons who knew of her life and its surroundings. In Carr v. Gale, 1 Curt. 384, 5 Fed. Cas. 116, Mr. Justice Curtis says that "it cannot be considered as the use of due diligence to suffer a trial to proceed, and after a verdict against him proceed to make the inquiries which he might and ought to have made before." Price v. Jones, 3 Head, 84; Martin v. Nance, Id. 649; Shipp v. Suggett, 9 B. Mon. 5. Moreover, in this case, as in that, the testimony offered is only cumulative. The court can well see how much more potential it would have been if the defendant had proved that the plaintiff had been adjudicated a lunatic, had been in an asylum, and had left it unimproved in the opinion of the asylum authorities, and how much more effective this proof may have been with the jury than the opinions of the clergymen and one of her own doctors that she was "crazy" or "unbalanced," etc.; but still it would have had no other than a cumulative effect in that direction upon the issue of the condition of her mind. It is said that on proof of an adjudication she might have been altogether excluded as a witness on the presumption of law that once insane always insane, until the contrary is made to appear. This is a misapplication of that presumption to the law of evidence. The inquiry for the court on the preliminary examination, when she was offered as a witness, would have been limited to her understanding of the obligations of an oath and ability to comprehend the examination as a witness.

This matter was fully considered in the case of District of Columbia v. Armes, 107 U. S. 519, 2 Sup. Ct. 840, as it had previously been considered in the case of Reg. v. Hill, 5 Cox, Cr. Cas. 259, commented upon by Mr. Justice Field in his elaborate judgment. Both Mr. Justice Field and Lord Chief Justice Campbell approved the rule of Baron Parke in an unreported case, that "it is for the jury to determine whether the person so called has a sufficient sense of religion in his mind, and sufficient understanding of the nature of an oath, for the jury to decide what amount of credit they will give to his testimony"; and the lord chief justice said that "the proper test must always be, does the lunatic understand what he is saying, and does he understand the obligation of an oath? The lunatic may be examined himself, and his state of mind may be dis-

covered, and witnesses may be adduced to show in what state of sanity or insanity he actually is. Still, if he can stand the test proposed, the jury must determine all the rest."

On this practice the court would undoubtedly have permitted the plaintiff in this case to go to the jury with her own evidence. Enough was developed by her own conduct at the trial to show that she was then and there of sufficient comprehension to fully understand all that was said to her. Her testimony was intelligently delivered, and if with the artfulness that sometimes belongs to insane persons it was for the jury to determine. As to the obligations of an oath, it was manifest from the developments of the proof, and particularly from the proof of the clergymen who were examined in this case, that she was given to a rather high state of religious feeling; and there can be no doubt from what did occur at this trial that she would have stood the test of any examination as to her sense of the obligation of an oath. So, at last, it is only a technical situation that a preliminary examination upon this subject did not occur; and the court, being now satisfied from what did occur that on a preliminary examination her testimony would have been admitted, and the question left to the jury as to the effect of her alleged insanity upon her credibility as a witness, will not now grant a new trial merely because there was no such preliminary examination. On the whole, this ground for a new trial should be overruled. Neither technically nor on its merits is it sufficient to furnish any just foundation for a new trial.

Also this application for a new trial would be refused if it rested alone upon the objections that have been taken to the sufficiency of the proof to establish the fact that excessive force was used by the agent of the defendant company in recovering possession of the parrot and its cage. I use the word "excessive" advisedly and discriminatingly. It was and is almost incomprehensible to me how the jury could have reached the conclusion that there was any "excessive" force used on this occasion. It would seem that the almost perfect condition of the frail structure of lath and small nails constituting the cage would prevail as a physical circumstance over the mere opinions of witnesses as to the extent of the force used; for it looks as if it would be impossible for any really formidable struggle to have taken place between two persons for the unhanding of such a frail structure without tearing it to pieces. In the light of that fact, the court has been wholly at a loss to conjecture upon what theory the jury could have proceeded to find excessive force, unless it may be that, believing that the plaintiff had been as seriously injured as she claims to have been, they concluded that there could not have been such an injury without a formidable struggle, which the cage withstood notwithstanding its frailty. It must be remembered here that there was no concussion or blow of any kind ensuing from the struggle, and that all of the witnesses describe it as merely a grappling between the two for the possession of the cage, with such physical "wrenching" as the plaintiff claims by her proof took place. It might be reasonable to infer that a "wrench" that would strain the vertebræ of the plaintiff's

spinal column, and seriously injure the spinal cord, would have "wrenched" the bits of wood of which the cage was made from their fragile fastenings. Yet the jury seems to have taken a different view of the importance of this fact, and this they had a right to do, for it is their duty to determine the weight to be given to the testimony. Therefore, if there were not other reasons presently to be mentioned governing the court in this judgment, the verdict would not be disturbed on that account.

It may be mentioned here, however, that counsel for the plaintiff in the argument upon this motion has suggested an altogether probable and satisfactory basis for the verdict of the jury in respect of this question of the force used by the agent of the company in retaining possession of the property. Counsel substitutes the word "unnecessary" for "excessive" force, and thinks the jury proceeded upon what he claims to be an entirely proper and justifiable theory that with a woman, weak and frail as the plaintiff was, no force at all was required to keep possession of the bird and cage; that the agent, instead of taking the cage from her, could have prevented her departing with it by merely obstructing her exit from the room; and so he says that any force was unnecessary, and therefore excessive. It is not at all improbable that this is the true solution of the verdict of the jury. Whatever may be said of its soundness as a legal proposition, it was not the theory of the instructions to the jury upon this subject of excessive force. The court was then, and is now, of the opinion that the agent was not under any legal obligation to resort to the course suggested by this argument of counsel. Undoubtedly, as it turned out, it would have been better if the agent had adopted that plan, and unless a suit had been then brought for false imprisonment probably his company would have escaped any claim for damages. One who is a trespasser and a wrongdoer, undertaking to carry away the property of another, has no just cause to complain if physical force is used to prevent the asportation of the property; and the court is of the opinion that the agent had a right to lay hold of the cage, and take it from the plaintiff's possession while she was undertaking to carry it away from the room, and the only liability for which the company can be held is any violence of physical force or battery, and the theory of the charge to the jury was that they must find in that which the agent did some unnecessary violence of physical action; and, if the jury were misled into adopting the theory suggested by counsel, it was the fault of the court not to have had it more plainly understood what the legal right of the defendant was in that behalf; and this, of itself, might furnish a sufficient ground for a new trial, and possibly it ought to be granted for that reason. But the court prefers to adhere to its original line of action in the trial of this case, and to rest its judgment upon the real objection there is to this verdict.

Notwithstanding there have been two verdicts in this case in favor of the plaintiff, the court is constrainedly of the opinion that the jury may be entirely wrong in its finding that there has been any substantial injury to the plaintiff by reason of that which oc-

curred on the occasion of which she complains. It would be sufficient, and probably it would be best, for the court to go no further than to announce its disapproval of the verdict in this regard; but I think it is due to the parties, if not to the court itself, that some explanation should be made of this dissatisfaction on the part of the court. The information is that the former verdict was set aside by the learned judge then presiding because of a similar discontentment on this point, and there being two verdicts in favor of the plaintiff only adds to the embarrassment that the court now feels in granting a new trial. Notwithstanding this embarrassment, I am not contented to let the verdict stand.

It may be asked, as it was suggested in argument, why the court did not direct a verdict as requested by the defendant company, if it takes the view that the proof was not sufficient to sustain the verdict. Unquestionably this case is not one for the direction of a verdict, but, on the contrary, is distinctly a case which ought to be submitted to a jury. But it does not follow, because it ought to be submitted to a jury, that the court should let the verdict stand, nor even two verdicts, possibly not three or more, if at each succeeding trial the proof should be precisely the same and no stronger for the plaintiff at the last than the first trial. The case of Railway Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463, makes, and was intended to make, this distinction entirely clear, and there could be no more pertinent illustration of the distinction itself than that furnished by the case we have in hand. Here, as will directly appear, there was not only the testimony of the plaintiff herself as to the extent of her injuries, but it was supported by that of the expert physicians introduced in her behalf. It would be a plain usurpation on the part of the court to direct a verdict on such a state of the proof, and yet the duty of the trial judge to scrutinize the proof, and determine, on an application for a new trial, whether the verdict should stand, is just as plain. It is as much a part of the right of trial by jury to have the court exercise this function of inspecting the verdict after it is rendered as it is to have the 12 men hear the testimony and try the fact. The time might come when it would be the duty of the court to yield even to the perversities of the jury, and not any longer interfere with their verdict, but two verdicts are not ordinarily conclusive of that duty. Three verdicts have sometimes been thought sufficient to invoke the duty of noninterference, and by statute in some of the states that has been made the rule of judgment.

The most important cases on this subject of directing a verdict are gathered in the very satisfactory opinion of Mr. Circuit Judge Lurton in the case last cited, and a careful perusal of that which he says will be convincing on this point. "Neither is it a proper standard," says that learned judge, "to settle for a peremptory instruction that the court, after hearing the evidence in the case, would, upon a motion for a new trial, set aside the verdict. The court may, and often should, set aside the verdict when clearly against the weight of the evidence, where it would not be justified in directing a verdict. Neither do we understand this view to be

in conflict with anything decided by the supreme court." It appears very clearly from the cases there cited that the mere "dissatisfaction" of the judge with the verdict is not a sufficient ground for disturbing it, and that phrase is not used to express the notion that he sets the verdict aside because he would have decided on the facts differently; but in determining the question which he has a right to determine, namely, whether the verdict is fairly sustained by the evidence, he must necessarily weigh the testimony very much as the jury does, and therefore the "dissatisfaction" referred to means that he is of the opinion, upon such judicial scrutiny of the proof, that the verdict is one that reasonable men ought not to have rendered. That is the nature of his dissatisfaction, and must be, when he may properly grant a new trial. The difficulty always arises in the application by the trial judge of this process to the particular circumstances he has in hand. It is so easy to glide from the essential duty of setting aside unjustifiable verdicts into the usurpation of the functions of the jury that it is a most difficult task to avoid it. Still it must and should be performed in every case with such conscientious intelligence as belongs to the judge, and that is the best that can be done in any case where he is called upon to discharge that duty. And he alone can perform it. If it be a case that should go to the jury, his action in granting or refusing to grant a new trial cannot, properly, be reviewed on a writ of error; nor can the appellate court indirectly do that thing under any proper exercise of its power to determine whether a verdict should or should not have been directed. However difficult to do it, the line of demarkation must be observed, or there is a re-examination of a fact tried by a jury "otherwise" than according to the rules of the common law. Const. U. S. Amend. 7; Railway Co. v. Lowery, supra. Hence the necessity for careful action, on a motion like this, by the trial judge.

My experience in the trial of this class of cases has grown to be quite a large one, through a somewhat long judicial service, and properly I may say that I quite thoroughly agree with some of the views expressed in a recent article in the North American Review of February, 1897, as to the alarming increase of favoritism in the jury box towards the plaintiff in litigation of this character. It is not necessary to analyze or descant upon the causes that may exist for this favoritism. That it does exist is beyond question, and the preservation of the right of trial by jury itself is, in my judgment, involved in the duty of the courts to protect the litigants and the jury against the indulgence of an overweening partiality for verdicts giving damages for personal injuries that are not clearly and satisfactorily established by the proof. The trial judge is apt, with the approval of revising courts, to resort to the usurpation of the functions of the jury, and direct a verdict when he should not, thereby depriving the citizen of his right to trial by jury, in order to escape the consequences of such favoritism in the jury box. Hence he should freely exercise the only power there is or can be under our constitutional guaranties to set aside the verdict in this class of cases, whenever he has reason to believe that

the verdict has been influenced by that kind of partiality to which the writer in the North American Review adverts. I should not feel authorized to cite mere lay writing in aid of judicial judgment, were it not for the fact that there is there cited abundant support in expression of opinion from the bench itself. In almost every charge I have given for many years I have adverted to the existence of this favoritism, and sought to guard the jury against it, as I did in this case, but have often felt, when the verdicts are rendered, that there is some foundation for the constantly recurring criticism which we see everywhere arising out of this fact, that the juries cannot be implicitly trusted to do even-handed justice in personal injury cases. I am glad to say that sometimes they do act with the utmost impartiality, but often they clearly do not. I have seen them act unjustly towards the plaintiff, and have set aside their verdicts on that account. There are possibly extremes of criticism on the subject, and the fault is not always with the jury perhaps, so that the difficulty is not entirely blamable to the system. But what I do mean to say on this occasion, as a justification to the action now taken, is that it is my judicial habit in this class of cases to exercise the right of inspection of the verdict much more readily and freely than in other classes of cases, where the occasion for its exercise does not so often arise. The trial judge alone can employ this remedy, and that condition demands at his hands the careful use of the power to meet any extraordinary requirement.

At first, within my judicial experience large verdicts for damages in personal injury cases were confined to those instances where the severity of the injury was manifest on the body itself; to cases where cripples had been made and maiming had been done. More recently there has been a very noticeable increase of cases where apparently there has been the slightest physical disturbance, and the facts disclosed only the slightest causes of injury, and yet there is set up the largest claim for damages, because of some alleged occult injury to the spinal cord or the brain or some other invisible organs or tissues of the body; it being claimed that there has been left as a permanent affliction some "traumatic neurosis," as in this case. I do not know whether it is authentic or not, but I have lately seen somewhere in my reading the statement of a case where a woman had recovered large damages against a railroad company because of a physical injury that made her barren, in the opinion of the expert doctors who were examined as witnesses in her behalf, but, pending long-delayed proceedings, she had given birth to children before the appeal was heard. There are many cases told of crutches thrown away after verdict. This class of personal injury litigation requires at the hands of the court and jury, unquestionably, far more vigilance of treatment than those cases where the injury is obvious. They afford an almost unlimited scope for the exhibition of unreliable, if not false, testimony. They depend largely for success upon the bare opinions of medical men employed as expert witnesses by the party offering them.

The courts and juridical writers have often commented upon the unsatisfactory character of all expert testimony, and many sugges-

tions have been made for mitigating the evils attending it, such as the employment only of official experts, not at all selected by or in any way connected with the parties to the suit. Within a few weeks there has occurred a case in my own experience where the injury claimed was of this hidden nature. The plaintiff's own doctor testified with great fullness to the impoverishment of nerve nutrition, and a consequent permanent disability for physical exertion adequate to remunerative labor. Expert physicians were introduced to support this theory. The railroad doctors, on the other hand, with equal confidence, testified that there had been no serious impairment of the man's physical abilities. In numbers and professional character these doctors on either side were of equal weight. It was suggested by one of the counsel that the court appoint a medical expert independently selected, and it was agreed between the parties that the court should choose two such examiners. The court declined to make any selection, but allowed the parties themselves each to name a medical man. This was done, they made a wholly independent examination of the plaintiff, and both testified that there was no serious or permanent injury then existing. Notwithstanding this, and the corroboration of circumstances showing that the injury done to the body was apparently not serious, and the violence of the fall from the car was apparently not greater than usually attends a fall of five or six feet, the jury gave an enormous verdict for the plaintiff, which, upon a motion for a new trial, I set aside for precisely the same reasons that actuate me in this case, although the negligence of defendant company was clear, if not admitted.

I do not mean to impute to the medical profession any complaisance of professional opinion that does not equally belong to the legal profession and all other professional or quasi professional experts; but with all men, in all employments, benevolence and sympathy with those who seek a mere opinion upon subjects of expert knowledge dominate the judgment that is given. If a lawyer comes to a brother attorney, and wishes him to estimate the value of his professional services, he is almost certain to put the estimate at the most that is possible to meet the views of him who applies, because it is a kind of courtesy of benevolence to think as well of one's services as that one does himself. If a client comes to a lawyer and wishes professional advice, the lawyer is very apt to shape his opinion in accordance with the wishes of the applicant, and not only that, but he is willing to go into the courts to vindicate that opinion, and will vigorously adhere to it after it has been decided against him through all the courts, and by that of last resort. It is a human tendency, and is the weakness of all expert testimony. Doctors of medicine are as much liable to follow this tendency as other experts, if not more, and it is no imputation upon their fairness and their honesty and skill to challenge and scrutinize any opinions that they offer on either side of a controversy like this.

When one is called upon to testify in court as to his observation of facts that are within his perceptive faculties, be he expert or

not, he will rigidly confine his testimony to the exactness of the occurrences he has observed; but when one is called upon to give a mere opinion as to the effect, in any science, of given facts, upon the law of that science, there is a wide scope for the adoption of an opinion that will be pleasing and satisfactory to him who asks it or is willing to pay for it, and then the human tendency which has just been mentioned operates in that direction. Therefore it is that no trior of the fact should accept as the sole basis of his judgment expert opinions merely because they are conscientiously entertained, but should subject them to the test of conformity to the established physical facts and circumstances appearing in the case. A pin scratch may produce death, but ordinarily it does not, and if in the given case any more likely cause for the death appears it would be unreasonable to attribute it to so slight a cause, even though there might be medical opinion to that effect, and if there be medical opinion against the slighter cause producing such an effect it would only add to the unreasonableness of such a judgment. At all events, verdicts for large damages in cases of that character should not be made final until there has been such assurance of justness as would be founded in an adequacy of proof, and not in the mere human sympathy of jurors, which is not always justified by the particular facts. Particularly there is nearly always indiscrimination in this regard where women and other helpless creatures are involved, as against strong and aggressive men, who are often expected to yield more than the law requires to sex or weakness in an adversary. Often the mere sentiment of gallantry to woman dominates the jurors and the judge when it should not. It is this doubtful character of the proof adduced in this case, as to the existence of the plaintiff's injuries, and the presence of the disturbing elements of possibly an undue sympathy on the part of the jurors, that causes me to hesitate about the fairness of this verdict, to doubt its justness, and to feel that it is unreasonable that it should have been found upon the proof in this case.

Being convinced, and having determined as matter of law, to which conclusion I still adhere, that the defendant's agent had a right to lay his hands upon the cage, and forbid the plaintiff to depart with it, and that he might lawfully, with such force as was necessary, take it from her possession when she had shown her perverse determination to carry it away either by her own hands or by those of her servant, I cannot, in considering the question of excessive violence as submitted to the jury, heed the facts and circumstances in the proof in relation to any supposed duty of the defendant's agent to resort to other effective means of detaining the plaintiff in a kind of imprisonment until she should be willing to yield. It is not a question of his reasonable choice of the means of defending his rightful possession, but a question of the reasonable use of those means which he lawfully adopted. In this view I do not see the justification of the verdict by the proof as we have it here. But, as before remarked, if this were all, I should most assuredly hesitate to disturb the verdict of the jury. Still, I think the apparent ease with which the jury reached the conclusion that

there had been any excessive violence on the part of the agent of the defendant company may be considered as an illustration of the complaisance with which they have regarded the proof in favor of the serious nature and character of the injuries which she claims to have suffered, and, taking the two issues together, it shows that the jury might have been dominated by an undue sympathy for an afflicted woman, and too great a readiness to attribute her affliction to the occurrence at the express office. For those afflictions of which she complains there was in this proof a far more abundant cause in relation to the physical injuries suffered in the violent fall she received when thrown from her carriage some time before the conflict over the bird and cage. This is not denied in the consideration of this case, but it is insisted that she had recovered from the effects of that injury. That is very doubtful on this proof; and again I am unable to see how reasonable men, as against all the facts of her subsequent residence in hospitals, and her subsequent conduct and condition as observed by the witnesses in this case, could reach such a conclusion upon the opinion of a doctor in New York, who spoke not only ambiguously, but evidently with slight, if any, attention to the real inquiry we have here, and her own belief that she had recovered, however honestly she may have entertained it. She was not on that occasion seeking medical opinion to sustain a claim for damages or any advantage to come of ill health, but to sustain an application for employment requiring good health, and she got what she wanted. There is in the case something more than a mere scintilla of proof in favor of such a recovery of her health, but it does not seem to me to be of that convincing and preponderating character which a jury ought to accept as conclusive, and it occurs to me to be reasonable to further consider the question of whether or not the injuries of which the medical men testify were a continuation of the old affliction or the result of the conflict over the bird and cage.

As to the medical testimony about the existence of the injury itself, and it being likely to result from comparatively so slight a physical force, even taking as true the plaintiff's own story, and I am not at all convinced that it is reasonable to support the verdict upon it. There was medical testimony against that theory, and particularly that of the doctor who attended her about the time of this occurrence at the express office and afterwards, and whose testimony is so much belittled in argument because he was only a "country" or "blue-mass" doctor. Whatever defects of technical education there may be about this physician, he testified to facts and circumstances in relation to the plaintiff's health history and her conduct on this occasion that do not support the theory that she had been seriously injured at the time, but rather tend to show that the idea of great injury was wholly an afterthought on her part. Every medical man who spoke in favor of the injury being caused by the struggle over the bird and cage, that did not injure the cage at all or only slightly, spoke with evident hesitation to attribute so formidable an injury to so slight an origin, and they mostly spoke from the somewhat exaggerated description of ex-

80 F.—7

amining counsel in putting the hypothetical case, rather than from any exactness of comprehension about the facts. Not unnaturally counsel, in stating an hypothetical case, will use language and forms of expression and give out as in argument his own physical indication, as he conceives it, of the violence that was used, which affects the medical man when he is considering the law of cause and effect; and, on the other hand, the same process of examination by the defendant's counsel would belittle the force used, and affect the opinion of his medical man. But these are only indications of the inherent weakness of such testimony, and an illustration of the facility with which it may be procured and the ease with which opinions may be influenced. No one can doubt that it is not impossible for the most serious injury to result from very slight force, and that was the effect of the testimony of the medical men in this case, accompanied by the expression of opinion that, to use their own language, in the absence of any other sufficient cause, they would say that this injury came from this cause; but, after all, their opinion was based upon the acceptance by them of the supposition that she had recovered from the injuries received by the greater cause at the time she was thrown from the buggy. Taken altogether, these opinions of the medical men did not and do not impress me as being sufficiently well founded to justify this verdict. On another trial it may be that the facts and circumstances will show that the plaintiff has been injured by that which occurred at the express office, and I am well aware of the fact that I am assuming a grave responsibility in setting aside a verdict which is the second in the plaintiff's favor; that I am in some danger of trenching upon the right of the plaintiff to have the weight of this proof determined by the jury, and not by me; but the law commits this responsibility to the hands of the trial judge for the very purpose of protecting parties from what may seem to be unjust verdicts; and so I must accept that responsibility, give expression and effect to my decided conviction that the proof does not sustain the verdict, and that it is an injustice to the defendant company to permit it to stand as a reasonable verdict on such proof as we had at the trial. I could not direct a verdict for the defendant, yet I expected the jury on the proof, and the instructions given as to the law, to find for the defendant, and the contrary action was a surprise to me. I mention this merely to show the strength of the conviction I have that the verdict of the jury was not according to the weight of the testimony, and I can see in the case enough of opportunity to be misled by undue sympathy to account for it. It is better to submit the question to another jury. New trial granted.