THE PEOPLE, Plaintiff

v.

ADOLPHUS FAULKNER, Defendant

September Term, 1929

No. 144

District Court of the Virgin Islands

Christiansted Sub-Judicial District
St. Croix

November 4, 1929

249

WILLIAMS, *Judge*

Adolphus Faulkner is charged with aggravated assault and battery, in that it is alleged that he did cut one Nathaniel Gibbons across the face and on the chest with a razor, unlawfully, on or about the 2nd day of September, 1929. It appears from the evidence that the defendant, Faulkner, together with his sister, lived in a one-room house on Estate Hope; that the house is not on the main road to the village, but is the second house on a lateral path leading therefrom. This path appears not to have been a thoroughfare, but merely one for the use of the tenants of the houses abutting thereon, and only four or five feet from the house. It further appears, from the evidence, that Gibbons had been on what they call here a "spree," at Estate Jerusalem, and was on his way home bound to Estate Blessing. In going from Jerusalem to Blessing he was passing along the road through the village Hope. When he reached the vicinity of the house of Faulkner he heard a flute, and, having with him a banjo, which he apparently had been using at the spree at Jerusalem, he turned into the path leading to the house of Faulkner. Upon approaching the house his progress was arrested by the barking and growling of a dog. He called out to the occupant of the house to corral the dog or he would sound it — meaning thereby strike it down. He was told that the dog would do him no harm, as they were near, but he insisted upon the dog being taken in hand, and when that was refused he indulged in a lot of "billingsgate," here commonly described as "extreme language." He was told by the sister of Faulkner, and later by Faulkner, to move off, which he declined to do. At this warning he turned over his banjo to a third person

who was in the house, named Eastman, a visitor and witness in this case. Eastman took the banjo and went in the house while Adina Faulkner, the sister, tried to persuade Gibbons to desist from the use of his "billingsgate" and to leave the place, but to no avail, and she called on her brother to eject him, which he (the brother) attempted to do; he, being a smaller person, was not able to eject the larger and more powerful Gibbons. It appears that Gibbons roughly handled — though apparently not in any felonious way — the defendant, and as they were making no progress in their ejectment of Gibbons, Faulkner went inside and came out to the threshold of his house with an old razor ground down to about a quarter of an inch in thickness, and, as it appeared in court, it was rusty and of very dull edge, except on the very point, the razor being a square pointed one. It was not one that was ordinarily calculated to make a clean incision, but, as the point was square, it was capable of making a clean incision, provided it was used only at the point. Apparently the blow was struck with the point of the razor, thereby cutting the said Gibbons from the nose down to the chin, going clear to the cheek and a skin wound on the neck and chest. It may be mentioned here, that the parties knew each other and Gibbons claimed that he was a frequent visitor at the house of Faulkner, while the Faulkners flatly and stoutly denied that he had ever been in any house that they had to do with. From the testimony, I cannot tell what is the truth on this point, but I rather suspect that Gibbons was not a frequent visitor. This matter, however, may be determined by an inquiry of the Government Attorney, looking to a prosecution for perjury. For the purposes of the disposition of the case at it now stands it makes only a slight difference which way the finding on this point would be, as he was warned to leave the premises, which he should have done even though he might have been

a visitor. Of course, one being a frequent visitor to a place is apt to feel that a warning of that character is less to be heeded than by a total stranger. Many times by persisting a friend of the house may persuade the occupants to change their attitude, although this could scarcely be expected in this case, in view of the language and conduct of Gibbons. Thus the monitory growls and barks of what has been termed "man's best friend," euphemistically known as canine, but, in simple language, as a dog, led from one thing to another, until finally the defendant used a dangerous — and even deadly — weapon upon the proposed visitor, thereby giving some verity to the old adage "The Lord deliver me from my friends, I can take care of my enemies."

It is proper here to remark, that the evidence shows that Gibbons was a turbulent character, as he had been, several times, convicted of aggravated assaults and batteries, while there is no evidence of any conflict with the police on the part of the Faulkners. There is also some reason to believe that Gibbons might have been under the influence of liquor — as he had been on a spree at Jerusalem. His conduct would seem to have indicated such, as it is hardly reasonable to suppose that a sober person and friend of the house would have conducted himself in any respect as Gibbons did. A person of this description would be calculated to arouse fear in any person, particularly persons smaller than he — as the two occupants of this house were. It is reasonable to suppose that these people were fearful of this intruder. In this connection it is also appropriate to remark that the occurrence took place after dark, somewhere about eight o'clock. The environment was such that a call for any of the public authorities was impracticable, as there was probably no police within three or four miles, and they have no means of communication. It may be well also to emphasize the fact that the disturbance took place immediately in front of the door, and it was testified by both Gibbons and

253

Faulkner that the cutting took place while Faulkner was standing in his own doorway. At any rate, the whole action took place immediately in front of the door way and off of the main path. The case would be free of difficulty if the defendant had used a less dangerous instrument with which to repel the advances of the intruder. However, the use of the particular weapon some times may determine its character, that is to say, the use of a stick, ordinarily, might not be considered excessive force, but if it were used with great force and on the head or some vulnerable part of the body, it might be considered an assault excessive in its nature. While I apprehend a dangerous weapon might be used in some circumstances, in a way that might not characterize the act as dangerous to human life, and thereby render the use of the dangerous weapon less obnoxious in this instance. While the weapon used was certainly a dangerous one, and might have been, in some usage, a deadly weapon, it is apparent from the way the blow was struck that Faulkner did not intend to inflict a mortal wound. This fact is borne out by the further fact that the Government Attorney only charged Faulkner with aggravated assault and battery rather than with assault with intent to kill. If the Government Attorney felt that the assault was a deadly assault he should have been charged with assault with intent to kill. Therefore, as I have said, it is apparent that the Government Attorney himself did not regard the assault as of a deadly nature. For the purpose of the instant matter our Code (1921), subsections 7 and 8 of section 32, chapter 5, Title IV (14 V.I.C. § 298 (7) (8)), defines aggravated assault and battery thus:

"(7) When a serious bodily injury is inflicted upon a person assaulted;

"(8) When committed with deadly weapons under circumstances not amounting to an intent to kill or maim."

254

The act of Faulkner may be said to be a combination of defense of his person and his home. This feature of the matter is to be emphasized — that the defendant is charged with an assault in connection with a defense of his home and person, as I apprehend that he had a right to go out to the trespasser — which Gibbons was after he had been duly warned to leave the premises — and eject him. A somewhat unusual element from the standpoint of the American practitioner and decisions is involved in this case, namely, that there was no yard well defined or marked out in connection with this house; in fact the defendant merely rented, apparently, a room in the village at Estate Hope. There was nothing apparently — certainly nothing was shown from the evidence — to indicate just where his rights ended, as no boundary whatsoever was given to the land adjacent to the house. Without attempting to determine the outer limits of the right of such a house holder it would certainly seem that some rights inhered in him as to the land immediately in front of his door; that a person so humbly situated, as most of the country people in these islands are, has some rights, as well as one residing in a castle surrounded by walls and moats. His poverty should not subject him to the vulgar gaze or wanton obtrusion on the part of a passerby, at least not more than is absolutely necessary for such passage. Merely because the defendant happened to live in a house whose door opened immediately on a pathway is no reason for permitting a stranger to approach it in a way that would be calculated to humiliate him and render almost useless his property rights. I deem it advisable to make a fairly thorough survey of the law involved, generally, in this sort of case.

■-■ In the case of Lee v. State, 92 Ala. 15, 25 Am. St. Rep. 17, the court very well analizes the law on this subject, though that case involved a homicide, the general principles of which are applicable here. The court, inter alia,

said: "It is familiar doctrine, that in order to entitle a person to the benefits of the plea of self-defense against the charge of homicide, he must have employed all means in his power, consistent with his safety, to avoid the danger, and avert the necessity of taking life; and he must have retreated, if retreat was practicable; Carter v. State, 82 Ala. 13. In the old books of the law, the phrases, 'retreat to the wall,' or 'retreat to the ditch,' were much in vogue, as figurative expressions of the rule, that in order to avoid the necessity of taking life, combat must be declined, so long as the avenues of escape are open; 1 Hale P.C. 479-483; 1 Russell on Crimes 661. As one who has been forced to the wall, or to the ditch, can withdraw no farther, the law says he may there stand at bay, and resist assault, even to the taking of life. Upon like principles, a man's dwelling was regarded as the limit of retreat for him. In the turbulence of early times, men made their habitations holds of defense, and were often compelled to protect themselves therein. One's dwelling was regarded as his place of refuge. Its sanctity in this regard was fully recognized by the law. A man in his own house was treated as 'at the wall,' and could not, by another's assault, be put under any duty to flee therefrom; 1 Bishop's Crim. Law, sec. 858; Kerr on Homicide, sec. 180; Brinkley v. State, 89 Ala. 35; 18 Am. St. Rep. 87. A killing in defense of one's dwelling may be excusable in the eye of the law, when there would be no legal justification for the taking of human life, in like circumstances, to prevent a trespass upon property not the dwelling-house; Carroll v. State, 23 Ala. 28; 58 Am. Dec. 282; Simpson v. State, 59 Ala. 1; 31 Am. Rep. 1. This shows the solicitude of the law to secure one's abode as a haven of protection for him, and that the peculiar inviolability attaching to a man's habitation does not extend to his other property. It would seem that the special privileges pertaining to a man in his own habitation are available for his

protection only while he is in such space as is usually occupied for the purposes of the dwelling and the customary out-buildings; Pond v. People, 8 Mich. 150-181. The very circumstance of one being within the precincts of his dwelling, or of his business-house, serves as a warning to deter an assailant from intruding therein. No such evidence as a disposition to avoid combat, or to get out of the reach of danger, is afforded by the conduct of one who, when assaulted, merely withdraws to his own land, and there halts in a position exposed to attack. Manifestly, he has not availed himself of such shelter and protection as his house affords. He has not sought what is known to all men as an asylum of safety. His act is not calculated to give pause to one in pursuit. The common law would not say that he had gone to the wall. And we cannot say that he had fulfilled the duty of retreat. Nothing has been found in the books to indicate that a man, when upon his own land, is to be regarded as at bay, so as to be under no duty to yield further to an assailant, unless he is in his house, or within the curtilage or space usually occupied and used for the purposes of the house. When he is elsewhere upon his own land, the reasons which excuse him from withdrawing from the place which is to him as his castle and fortress do not apply; Jones v. State, 76 Ala. 8; note to State v. Patterson, 12 Am. Rep. 212. Not until he has reached this place of refuge can he claim the protection and privileges afforded thereby. When beyond its precincts, though upon his own land, he is under the duty to retreat, when retreat with safety to himself is practicable. This was the purport of the charges to which exceptions were reserved. The charges requested by the appellant are not reconcilable with the conclusion here announced. They were properly refused."

As to the right to expel trespassers, the Court, in Woodman v. Howell, 45 Ill. 367, 92 Am. Dec. 221 (223), declared: "We are aware of no rule that gives any person

257

not having a special irrevocable license the right to enter and continue upon the premises of another when requested to depart." And then the Court went on to observe, that — "To permit all persons at their mere will to enter and to remain in another's house, or even his close, so long as they may choose, and this, too, after being requested to depart, would wellnigh destroy the dominion of the owner over his property, and would render it almost useless as well as worthless. It would be monstrous to hold that a man's privacy may be so far infringed that any and all persons may at will enter his dwelling and remain, after being requested to leave, until it suited their convenience to depart. Although it might not be so offensive to permit it on the close of the owner as his dwelling, it would be an outrage upon his rights. Such has never been the law, and so long as there is such a thing as individual ownership of property, it is not probable that such will ever be."

██ In an excellent note attached to the frequently mentioned case of Hannabalson v. Sessions, 116 Iowa 457, 93 Am. St. Rep. at 254, it is said: "The cases are generally agreed that the person in the rightful possession of real property or premises connected therewith may use sufficient force to remove therefrom a person who, being a trespasser, has no right to remain and refuses to depart after being requested to do so, and that he incurs no civil liability in so doing, but if in thus asserting his rights he uses more force than is necessary to eject the intruder or inflicts unnecessary injury, he becomes liable therefor. Whether the force or violence used to eject a trespasser was unnecessarily severe, or whether it was merely such as was 'necessary' must, manifestly, depend to a great extent upon the circumstances of each particular case, and in this respect the courts seem very liberal toward the person seeking to eject the trespasser. In such cases courts cannot and will not undertake to pass upon the surroundings with very great

nicety in determining just exactly the amount of force which may be used by the owner in ejecting a trespasser from his property. Every case must be governed by its own particular circumstances, and they vary to such an extent and depend so much upon appearances and incidents occurring at the moment of the expulsion, that the owner must to a very great extent be left to determine for himself the means necessary to be used by him in the process of ejection, and in reviewing the discretion used by him, no great amount of speculation and refinement as to the probabilities can safely be indulged by the court. In the following cases the rule is maintained that if a person enters the premises of another after being ordered by the owner not to enter, or persists in remaining after he is ordered to depart, he becomes a trespasser and such owner has a right to use enough force to eject him from such premises and to prevent his re-entering. In other words the owner of the premises has the right to use such force as is reasonably necessary to prevent a person from trespassing thereon, but no more. The rule here applied is not unlike the familiar rule in criminal law that one in repelling an attack may use such force as would appear to be reasonably necessary to a person of ordinary intelligence, carefulness, and prudence, acting under similar circumstances: McDermott v. Kennedy, 1 Harr. (Del.) 143; Watson v. Hastings, 1 Penne. (Del.) 47, 39 Atl. 587; Woodman v. Howell, 45 Ill. 367, 92 Am. Dec. 221; Wharton v. People, 8 Ill. App. 232; Breback v. Johnson, 62 Ill. App. 131; Illinois Steel Co. v. Wasnius, 101 Ill. App. 535; Manning v. Brown, 47 Md. 506; Sampson v. Henry, 11 Pick. [Mass.] 379; Hamilton v. Arnold, 116 Mich. 684, 75 N.W. 133; Morgan v. Durfee, 69 Mo. 469, 33 Am. Rep. 508; State v. Howell, 21 Mont. 165, 53 Pac. 314; Harshman v. Rose, 50 Neb. 113, 69 N.W. 755; Markham v. Brown, 8 N.H. 523, 31 Am. Dec. 209; Scribner v. Beach, 4 Denio [N.Y.] 448, 47 Am. Dec. 265; Newkirk v. Sabler, 9

Barb. [N.Y.] 652; Gyre v. Culver, 47 Barb. [N.Y.] 592; Conway v. Carpenter, 80 Hun. 428, 30 N.Y. Supp. 315; Souter v. Codman, 14 R.I. 119, 51 Am. Rep. 364; Brothers v. Morris, 49 Vt. 460; Cuppert v. Morrison, 27 Wis. 365, 9 Am. Rep. 439; Wright v. Southern Express Co., 80 Fed. 85."

Pitford v. Armstrong, Wright (Ohio) 94, is authority for the following, that — "A person in the rightful possession of a house may legally assault and beat off anyone wrongfully forcing his way into it, but if he goes beyond defense and uses unnecessary force in such defense or in revenge or as punishment of the aggressor, he himself becomes a trespasser and is liable in damages for an assault." And in Fossbinder v. Svitak, 16 Neb. 499, 20 N.W. 866, it was held, that — "A person has the right to defend, with reasonable force, his property or premises, as well as his person, against invasion by a trespasser and the fact that injury is inflicted upon the invader will not make the resisting and ejecting person liable in damages for an injury thus inflicted in the reasonable defense of his house, lands or goods."

■ Of course, it goes without saying, that it is a universal rule that if a trespasser enters peacefully upon the land of another, and is discovered there, not doing any violence, that the trespasser should be warned to depart before any assault is made upon him. After such a request and refusal, the party in possession has the right to use such force as is necessary to expel the trespasser, and no more. Price v. State, 72 Ga. 441; Long v. People, 102 Ill. 331; Robinson v. Hawkins, 4 T.B. Mon. (Ky.) 134; State v. Woodward, 50 N.H. 527; People v. Osborn, 1 Wheel. C.C. (N.Y.) 97.

■ It has been repeatedly held that a mere trespass upon the land of another, even after the trespasser has been warned to depart and has refused, does not justify the

landowner in using a dangerous or deadly weapon to resist the trespass, and if the landowner shoots or otherwise injures the trespasser with a deadly or dangerous weapon, not in necessary self-defense, he is liable for the damages caused thereby. James v. Hayes, 63 Kan. 133, 65 Pac. 241; Elverton v. Estate, 24 Neb. 235, 38 N.W. 794; Montgomery v. Commonwealth, 98 Va. 840, 36 S.E. 371, 98 Va. 852, 37 S.E. 1; Wharton v. People, 8 Ill. App. 232.

 In State v. Lightsey, 43 S.C. 114, 20 S.E. 975, it is said: "A man has not the same right in repelling a trespasser from his outlying lands as he has from his residence lot, nor has he any right to take his gun as a means of running a trespasser off from his lands." Of course, the landowner has no right to kill a mere trespasser in the first instance, that is to say, he has no right to kill a person who is merely trespassing upon his land, even though the trespass is against the protest and command of the owner, and even though it may be accompanied with insulting and irritating words and gestures. People v. Flanagan, 60 Cal. 2, 44 Am. Rep. 52; People v. Hecker, 109 Cal. 451, 42 Pac. 307; State v. Warren, 1 Marv. (Del.) 478, 41 Atl. 190; Wallace v. U.S., 162 U.S. 466. The law does not justify the killing of a man to prevent a mere trespass upon land where such trespass could or could not be otherwise prevented. Harrison v. State, 24 Ala. 67, 60 Am. Dec. 450; McDaniel v. State, 8 Smedes & M. (Miss.) 401, 47 Am. Dec. 93. Nor would the law excuse a killing for a mere civil trespass upon a man's house, when the killing was done in circumstances from which the law would imply malice. Carroll v. State, 23 Ala. 28, 58 Am. Dec. 282. However, in Ayers v. State, 60 Miss. 709, it was held that the owner, on his own premises, has the right, by force, to evict a trespasser therefrom, or to restrain a trespasser from injuring his personal property, and he is justified in arming himself with any weapon and in using it to the extent of slaying the

trespasser if it should become necessary, in the progress of the difficulty, to protect his life or person from a felonious assault, and the fact that such owner assaults the trespasser to protect his person or property does not deprive him of his right to defend himself against the violence of the trespasser induced by such assault.

In Davidson v. People, 90 Ill. 221, and State v. Zellers, 7 N.J.L. 220, the holding was that a person is not justified in taking human life to prevent a mere trespass on his real estate or property, except in the case of his dwelling-house, which he may defend even to the taking of such life, if necessary, or apparently necessary, to prevent a trespasser from forcibly entering it against his will and when warned not to enter and desist from the use of force. For all other trespasses to real estate the law affords an ample remedy without resort to the killing of the intruder. When one is assailed by a trespasser in his dwelling-house he is not obliged to retreat, but is authorized to repel force by force, and to protect himself and his home from invasion, and if, in the reasonable exercise of his right of self-defense, as it appears to him at the time, he kills his assailant, the killing is justifiable homicide. People v. Coughlin, 67 Mich. 466, 35 N.W. 72; State v. Peacock, 40 Ohio St. 333. But in State v. Patterson, 45 Vt. 308, 12 Am. Rep. 200, it was held that a trespasser assaulting a house can be lawfully resisted and repelled to the extent of using deadly weapons and taking life, only in case the assault is made either with the intent of taking the life of the inmate or of doing him great bodily harm, and such resistance is necessary to prevent such crime, or in case the inmate has reason to believe from the circumstances, and in fact does believe, that it is necessary to prevent the commission of such crime. The rule is well summed up in State v. Taylor, 143 Mo. 150, 44 S.W. 785, where it is said, that — "The maxim 'Every man's house is his castle' does

not mean that the owner of a dwelling-house has the right to take life because of trespass upon the dwelling-house alone, irrespective of the nature of the trespass. To justify the taking of the life of the trespasser, the trespass must be with a design to commit a felony thereon or therein, or upon its inmates. A mere civil trespass upon one's dwelling-house does not justify him in killing the trespasser. The owner may resist such a trespass, opposing force against force, but he has no right to kill unless it becomes necessary to prevent a felonious destruction of property or the commission of a felony, or to defend himself against a felonious assault upon his person or that of some member of his family."

To state the general principles of law is a matter comparatively easy, but the application of the rule to a given set of facts many times causes considerable difficulty. There are cases on the border line or in the twilight zone, as we say, in trespass cases as in other cases. While property rights are to be respected as almost sacred, they are no more sacrosanct than human rights, and not so sacrosanct, I apprehend, as human life. Human life is almost the ultimate thing, and property rights are sanctioned and respected, primarily, I apprehend, because they are calculated to support life, or at least to make life more worth while. It is said that governments are instituted amongst men to secure life, liberty and the pursuit of happiness, life being the first element named. The law — as the above cases show and numerous others reinforce — but charily admits of the use of dangerous or deadly weapons. It generally condemns their use, except in the most necessary cases. They are to come in only in the case of exigencies, and not of caprice, that is to say, they are to be used only in what we may call in extremis, and not casually, and their promiscuous use has been nowhere more severely condemned than by the present incumbent.

■ Now, to recur to the facts in the instant case; while the defendant used a weapon — as worn and deteriorated as it was, hence it should be denominated as at least a dangerous weapon — I am inclined to give him the benefit of the doubt in view of the surrounding circumstances, as loath as I am to countenance the use of deadly weapons in ordinary quarrels, fracases and circumstances in which their use is not practically absolutely necessary to protect human life or the person from serious bodily harm. The intruder in this case was a disreputable character, of which there can be no doubt, if he may not be actually termed a dangerous character. As I have said heretofore, the defendant did not use the razor in a way that would indicate that he had intended any mortal consequences. It was a straight cut down rather than cross-wise the face. A cross cut might have indicated that he was striking at a vital part of Gibbons, namely, the juglar vein. There is nothing in this case to indicate any malice or deadly intent. It was simply an action on the spur of the moment, and, perhaps, out of fright that might not — to a person in the cool of the court or drawing room — be found justifiable. However, I am not prepared to say that in the circumstances of the case the defendant did not have such a fear, and was not justified, at the moment, in having such fear aroused in him, as would warrant him in using even a deadly weapon in a moderate fashion. If he had used a stick or club I apprehend it would be thought that this sort of defense was justifiable, although a blow from a stick or club might well prove as fatal as the use of a razor. Indeed, of course, a club may — when used with force — become a deadly weapon. State v. Godfrey, 17 Ore. 300, 11 Am. St. Rep. 830, 836. The defendant said that he had no means in the house with which to repel the intruder — no stick or anything of the kind — and the only thing that he could think of or had at hand was this old, practically worn out, razor. In view of all the

circumstances in the case, as I have said, I will give the defendant the benefit of the doubt. However, I wish, at the same time, to condemn the general use of lethal weapons. While their use may be intended only to do slight injury there is always a possibility, if not likelihood, of serious bodily harm, and even death, coming from their use. My doubt arises from a combination of the defense of his dwelling and person. If persons may generally do as this intruder did then property rights would become practically worthless. I repeat, that it is hoped that the conclusion in this case will not be calculated to liberalize the use of dangerous or deadly weapons, but will be understood in the light of the particular circumstances of this case, and even in such circumstances used only after in, practically, extremis, and with the greatest care not to cause more injury than is reasonably necessary to repel the attack or invasion. I again emphasize the fact that this holding is to be considered in the light of the circumstances of this case. Therefore, I have filed findings of fact and conclusions of law finding the defendant not guilty.